————o————

WM. G. CLARK, Appellant, vs. ROBERT MITCHELL, et al., Respondents.

1. War power—Payment of rent to Provost Marshal in late war—Military seizure of private property—Powers of Congress—Act of March 3rd, 1863—U. S. Constitution, 5th amendment—Limitations, statute of.—Where defendants, being sued on the covenants of their lease, pleaded that they had paid the rent reserved to the provost marshal of the district of Missouri, under and by virtue of the order of the military commander of that district; that the payment was omitted to be made to the plaintiff, and was in fact made for and on account of the plaintiff for the public use, as a necessary means of carrying on the military operations of the government of the United States in the State of Missouri, against the insurgents in said State, who were then seeking to overthrow said government, in said State; that said payment was made by virtue and under color of authority derived from and exercised under the President of the United States, and the act of Congress of March 3rd, 1863, and the two years limitation therein contained was pleaded in bar of plaintiff's action. Held, that the plea is insufficient on demurrer—and this, for divers reasons;

1st, It does not set forth the order on which defendant's rely, and thus tender a traversible issue.

2nd, The plea sets forth no impending necessity for the acts pleaded; which urgent necessity, admitting of no delay, is all that, even in time of flagrant war, will justify military seizure of private property.

3rd, Even if there had been such urgent necessity it could only have existed for just so much money, regardless of the ownership, and calling the money plaintiff's did not make it so, nor change that ownership.

4th, However the law may be in respect of the caption, during war, of personal property or of debts due the enemy, Congress does not possess the power to confiscate debts due from one citizen to another, and the act in question, in so far as concerns the case at bar, is clearly unconstitutional, in that it deprives the citizen of his property by giving sanction to a mere military order issued for that purpose; that this could not be done any more than Congress could prospectively authorize such seizure. Because under the 5th amendment of the

Constitution of the U. S , Congress is inhibited from depriving the citizen of "life, liberty or property without due process of law," and from taking "private property for public use without just compensation."

5th, That the phrase "due process of law," or its legal equivalent "law of the land" does not mean a law enacted for the purpose of working the wrong; but the general law—law in its regular course of administration through the courts of justice; a law which hears before it condemns; proceeds upon inquiry and renders judgment only after trial. The act under consideration, possesses no attributes of this description, and is, for that reason, violative of the constitution.

6th, The act being thus unconstitutional, the statutory bar which contains, is unworthy consideration. Besides, the right of the plaintiff, under the terms of the lease, accrued in the year 1862. Our statute of limitations then gave, and still gives, *ten* years in which to bring suit for breach of the covenants in a lease, and Congress cannot, by a subsequently enacted law, deprive the plaintiff of the right which had thus accrued to him under our own statutes, nor overturn those statutes, nor interfere with the jurisdiction of our State courts—and the powers of Congress were not enlarged in consequence of the civil war to which the act refers.

7th, Granting that the act of Congress is in all respects valid, it can have no applicability to this case, since it appears that the defendants paid their own money, and not that of the plaintiff, to the provost marshal.

*Appeal from  St. Louis  Circuit  Court.*

*Truslen Polk,* for Appellant.

*George P. Strong,* for Respondents, cited : Brown vs. United States, 8 Cr. 110 ; 1 Kent, pp. 59, 62, 64 ; Vattel, pp. 322, 323 ; 3 Grot. De Jure, &c. Chap. 8, § 4, *et seq.* 610 ; Hall. Intern'l Law, pp. 365, 447, 457 ; 6 Grot. Chap. 6, p. 580 ; Hall. Int. Law, 788, § 11 ; Cross vs. Harrison, 16 How. [U. S.] 164 ; 12 U. S. Stat. at Large [1863], 757, § 7 ; Const. Mo. art. 11, § 4 ; Drehman vs. Stifel, 41 Mo. 184, 202 ; Same case, 8 Wall. [U. S.] Supl. 595 ; Clark vs. Tichnor, 49 Mo. 144 ; State vs. Gutzweiler, 49 Mo. 17 ; Clark vs. Dick, 1 Dill. 8.

SHERWOOD, C. J., delivered the opinion of the court.

On the first day of February, 1859, plaintiff leased to the defendants for the term of seven years, two stores in block 96 on 4th street in the city of St. Louis, at a yearly rental of $7,000 payable in monthly instalments of $583.33.    The rents for August, September, and October, 1862, were not paid in accord-

ance with the covenants in the lease contained, and this suit was brought in January, 1868, to recover those sums with interest.

The defendants answered, setting up four defenses to the action, and the plaintiff demurred; but inasmuch as the demurrant was successful respecting all the pleas except the fourth one, that alone is subject here to revision and discussion.

The plea thus held sufficient is as follows:

" And for a further defense to said action, defendants say that the cause of action in plaintiff's petition alleged, if any such does or ever did exist, arose out of certain acts done and certain acts omitted to be done, that is to say, out of and from an alleged failure or omission to pay the rent reserved in said lease for the months of August, September and October, A. D., 1862, to the said plaintiff, and from a payment thereof made for and on account of plaintiff by defendant to the provost marshal of said district of Missouri for the public use, under and by virtue of the order and command of General J. M. Schofield, who was then in military command of the military district of Missouri, which embraced the State of Missouri ; that said payment was omitted to be made to the plaintiff, and was in fact made for and on account of the plaintiff, for the public use as aforesaid, as a necessary means of carrying on the military operations of the government of the United States, against the insurgents who were then seeking to overthrow said government in said State of Missouri, by virtue or under color of authority derived from and exercised under the president of the United States ; and said cause of action, if any such there be, or ever was, arose more than two years before the commencement of this action, and said action was commenced more than two years after the passage of an act by the congress of the United States, entitled an act relating to *habeas corpus* and regulating judicial proceedings in certain cases approved March 3d, 1863, and defendants set up and plead the limitations contained in said statute, in bar of said action and pray judgment, &c."

The demurrer in substance alleged that the answer stated no facts sufficient to constitute a defense to the action.

It will be observed at the outset of our intended examination into the sufficiency of the plea, that it fails to set forth the order relied on either in *hæc verba*, or in substance. Without this were done, it would be impossible to traverse the special matter thus pleaded.

The plea on its face shows that which, if true, amounts to a wrong at common law; shows that the tenants of a lessor were compelled to attorn to a stranger, by paying him rent; but such a wrong, in order to be justified, must needs have the authority for its commission so pleaded as to tender a traversible issue; thus at once apprising the plaintiff of its nature, and allowing the court to determine its sufficiency. And no difficulty could be experienced in this regard, if the authority claimed really existed. (Pean vs. Beckwith, 18 Wall. 510.)

The above is not the sole objection to be urged to the plea.

There are doubtless cases in which a military officer may take, or destroy, private property, but this is only allowable under circumstances of imminent and overpowering necessity as, ex. gr.; where in time of flagrant war, forage or provisions are taken for troops, or a dwelling house used for the erection of bulwarks against an advancing enemy. But in such case, neither the officer who commands, nor those who obey, are liable to an action, nor to be regarded as trespassers, and therefore stand in no need of legislative protection. (Mitchell vs Harmony, 13 How. 115; Parham vs. Justices, &c., 9 Geo. 341, and cas. cit.)

That class of cases is, however, obviously distinguishable from those where a commander, influenced by motives of mere expediency, or ideas of *general necessity*, seizes and appropriates the property of individuals.

Thus in Mitchell vs. Harmony, *supra*, where it was pleaded that the property was taken to prevent it from falling into the hands of the enemy, and that it was taken for public use, Chief Justice Taney, in delivering the opinion of the court *inter alia* remarked: " The only subject for inquiry in this court is, whether the law was correctly stated in the instruction of the court; and whether anything short of an immediate and impending danger from the public enemy, or an urgent necessity for the public

service, can justify the taking of private property by a military commander to prevent it from falling into the hands of the enemy, or for the purpose of converting it to the use of the public."

"The instruction is objected to on the ground, that it restricts the power of the officer within narrower limits than the law will justify. And that when troops are employed in an expedition into the enemy's country, where the dangers that meet them cannot always be foreseen, and where they are cut off from aid from their own government, the commanding officer must necessarily be intrusted with some discretionary power as to the measures he should adopt; and if he acts honestly and to the best of his judgment, the law will protect him. But it must be remembered that the question here, is not as to the discretion he may exercise in his military operations or in relation to those who are under his command. His distance from home, and the duties in which he is engaged, cannot enlarge his power over the property of a citizen, nor give to him, in that respect, any authority which he would not, under similar circumstances, possess at home. And where the owner has done nothing to forfeit his rights, every public officer is bound to respect them, whether he finds the property in a foreign or hostile country or in his own. There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service, or take it for public use. Unquestionably in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser."

"But we are clearly of opinion that in all of these cases the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. It is impossible to define the particular circumstances of danger or necessity in which this power may be lawfully exercised. Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to

exist before the taking can be justified. In deciding upon this necessity, however, the state of the facts, as they appeared to the officer at the time he acted, must govern the decision ; for he must necessarily act upon the information of others, as well as his own observation. And if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is immediate and menacing, or the necessity urgent, he is justified in acting upon it ; and the discovery afterwards that it was false or erroneous, will not make him a trespasser."

" But it is not sufficient to show that he exercised an honest judgment and took the property to promote the public service ; he must show, by proofs, the nature and character of the emergency, such as he had reasonable grounds to believe it to be, and it is then for the jury to say whether it was so pressing as not to admit of delay ; and the occasion such, according to the information upon which he acted, that private rights must, for the time, give way to the common and public good."

" But it is not alleged that Colonel Doniphan was deceived by false intelligence as to the movements or strength of the enemy at the time the property was taken. His camp at San Elisario was not threatened. He was well informed upon the state of affairs in his rear, as well as the dangers before him. And the property was seized, not to defend his position, nor to place his troops in a safe one, nor to anticipate the attack of an approaching enemy, but to insure the success of a distant and hazardous expedition, upon which he was about to march. The movement upon Chihuahua was undoubtedly undertaken from high and patriotic motives. It was boldly planned and gallantly executed, and contributed to the successful issue of the war. But it is not for the court to say what protection or indemnity is due from the public to an officer, who, in his zeal for the honor and interest of his country, and in the excitement of military operations has trespassed on private rights. * * * * Our duty is to determine under what circumstances private property may be taken from the owner by a military officer in a time of war, and the question here is whether the law permits it to be taken to insure the success of any enterprise against a public

enemy which the commanding officer may deem it advisable to undertake. And we think it very clear that the law does not permit it."

"The case mentioned by Lord Mansfield, in delivering his opinion in Mostyn vs. Fabirgas, 1 Cow. 180, illustrates the principle of which we are speaking. Capt. Gambier, of the British Navy, by the order of Admiral Bocawen, pulled down the houses of some sutlers on the coast of Nova Scotia, who were supplying the sailors with spirituous liquors, the health of the sailors being injured by frequenting them. The motive was evidently a laudable one, and the act done for the public service. Yet it was an invasion of the rights of private property, and without the authority of law, and the officer who executed the order was liable to an action, and the sutlers recovered damages against him to the value of the property destroyed."

"This case shows how carefully the rights of private property are guarded by the laws of England; and they are certainly not less valued nor less securely guarded under the constitution and and laws of the United States. * * * * * If the power exercised by Colonel Doniphan had been within the limits of a discretion confided to him by law, his order would have justified the defendant even if the commander had abused his power, or acted from improper motives. But we have already said that the law did not confide to him a discretionary power over private property. Urgent necessity would alone give him the right; and the verdict finds that this necessity did not exist. Consequently, the order given was an order to do an illegal act; to commit a trespass upon the property of another, and can afford no justification to the person by whom it was executed."

The case of Captain Gambier, to which we have just referred, is directly in point upon this question; and upon principle, independent of the weight of judicial decision, it can never be maintained that a military officer can justify himself for doing an unlawful act, by producing the order of his superior. The order may palliate, but it cannot justify."

But conceding that the plea shows such circumstances of urgent necessity as would free the act from all culpability, and the

actor from all liability, by what process of ratiocination, by what *ingenious fiction* is it, that Mitchell's money, without payment or delivery to, or authority from Clark, becomes, *ipso facto*, the money of the latter, by a mere payment to a stranger?

If the defendants had died possessed of that money, would it not have passed to their legal representatives irrespective of the fact that they owed that precise amount to their lessor? Undoubtedly it would. This being true, it can but follow that *calling* the money *Clark's* neither alters its *status* nor changes its ownership. Besides, if the imminent necessity for the seizure of the money existed at all, it could have no possible connection with the fact of ownership, since, whether plaintiff's or defendant's, it would be equally effective in furnishing the munitions of war. In short, the necessity existed, if indeed it had an existence, *for just so much money*, regardless of whose coffers it enriched or whose purse it depleted; so that it becomes manifest that even the above made broad concession imparts no additional or supplemental efficacy to the defendant's plea.

Citation has been made by defendant's counsel to authorities as supporting the plea in respect to the caption of private debts, as occupying the same footing as personal property; though none of the authorities thus cited go further than to announce that doctrine in regard to debts due by citizens to the enemy with whom the nation is at war, and obviously can have no application to debts between citizens of the same nationality. And even in the case of the enemy's property remaining on land at the commencement of hostilities, it has been held it cannot be condemned as such without a special legislative act authorizing its confiscation, and that the declaration of war is not such an act. (Brown vs. United States, 8 Cranch, 110; 1 Kent Com., pp. 64, 65.)

But it surely will not be seriously contended that congress possesses the power to *confiscate* debts due from one citizen to another. And yet this must be the ultimate position of defendants in this regard if they rely on the act pleaded. For if the debt was not seized under circumstances which would justify the act irrespective of legislative enactment, then it results that the

subsequent ratification, so to speak, of the unlawful act, is neither more nor less in its effects, consequences and actuality, than *congressional confiscation*.

The temerity would be great which should assert that congress could, by the mere passage of a bill, authorize the *prospective* seizure of private property for public use, without just compensation : and yet " to this complexion must we come at last," if the defendant's view of the proper construction of the act under consideration he adopted, since no appreciable distinction can be taken between an act which beforehand gives permission and one which in the end gives sanction and protection.

And to say that congress possesses such powers, would be to accord to it the omnipotence claimed for the British Parliament. But our Federal Legislature is expressly inhibited by the Fifth Amendment to the constitution, from depriving the citizen " of life, liberty or property without due process of law," and from taking private property " for public use without just compensation."

That this article is thus restrictive of the action of congress and of the government, of which it is the legislative exponent, has been expressly adjudged. (Barron vs. Baltimore, 7 Pet. 243 ; Withers vs. Bulkley, 20 How. 84 ; Twitchell vs. Commonwealth, 7 Wall. 321.)

And it was, as the cases just cited, and the history of that period to which they refer, show, to quiet serious apprehensions respecting the encroachments of federal power, that gave origin to the adoption of the ten original amendments to the constitution. Whether these apprehensions were altogether groundless, let subsequent history say.

The right of private property has, in England, been almost as sedulously cherished and zealously guarded as that of liberty and life. The great commotions of that country have been, perhaps, as often brought about by illegal exactions and tortuous seizures of money or property, as by the gravest governmental aggressions against life and liberty.

A few extracts shall suffice to show how strongly cherished is the right of private property in that country : " It is indeed an

essential principle of the law of England, that the subject hath an undoubted property in his goods and possessions ; otherwise there shall remain no more industry, no more justice, no more valour ; for who will labor ? who will hazard his person in the day of battle for that which is not his own ?" ( Broom Const. L. 228. ) And this right is elsewhere termed "*jus indigenæ,* an old home born right, declared to be law by divers statutes of the realm." A " vital law of property " which though often infringed, " yet as often has parliament interposed to relieve the public liberty so endangered, and to repair the inroads on the constitution so made " (Ib. 234). And so jealously guarded was this " *home born right,*" that it prevailed even against the royal prerogative. (Bankers Case, Turn. 11, 12. )

In the famous case of Entick vs. Carrington (19 St. Tr. 1030 [S. C.] ; 2 Wils, 275), Lord Camden, C. J., said " the great end for which men entered into society was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been taken away by some public law for the good of the whole. The cases where this right of property is set aside, by positive law, are various. Distresses, executions, forfeitures, taxes, etc., wherein every man, by common consent, gives up that right for the sake of justice and the general good. By the laws of England every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action, though the damage be nothing ; which is proved by every declaration in trespass, where the defendant is called upon to answer for bruising the grass and even treading upon the soil. If he admits the fact, he is bound to show by way of justification, that some positive law has empowered or excused him. The justification is submitted to the judges who are to look into the books and see if such a justification can be maintained by the text of the statute law, or by the principles of common law. If no such excuse can be found or produced, the silence of the books is an authority against the defendant, and the plaintiff must have judgment."

And our own jurists, to their honor be it said, are no less emphatic, when treating of the right of private property. Mr. Justice Story, when speaking in reference to the 5th amendment before mentioned, says : " The next clause prohibits any person from    *    *    *    being deprived of life, liberty or property without due process of law.    This also is but an affirmance of a common law privilege, but it is of inestimable value.    *    *    * The concluding clause is that private property shall not be taken for public use without just compensation.    This is an affirmance of a great doctrine, established by the common law for the protection of private property.    It is founded in natural equity, and is laid down by jurists as a principle of universal law.    Indeed in a free government, almost all other rights would become utterly worthless, if the government possessed an uncontrolable power over the private fortune of every citizen.    One of the fundamental objects of every good government must be the due administration of justice ; and how vain it would be to speak of such an administration, where all property is subject to the will or caprice of the legislature and the rulers."

In Calder vs. Bull (3 Dall. 386), Chace, C. J., said ; " The people of the United States erected their constitutions or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty and to protect their *persons* and *property* from violence.    The purposes for which men enter into society will determine the *nature* and *terms* of the *social* compact, and as they are the foundation of the *legislative* power, *they* will decide what are the *proper* objects of it.    The *nature* and *ends* of *legislative* power will limit the *exercise* of it.    This *fundamental* principle flows from the very nature of our free republican government, that no man should be compelled to do what the laws do *not* require, *nor to refrain* from acts which the laws permit.    There are acts which the Federal or State legislature cannot do *without exceeding their authority*.    There are certain *vital* principles in our *free republican government* which will determine and overrule an *apparent* and *flagrant* abuse of legislative power, as to authorize *manifest injustice by positive law*, or to take away that security for *personal lib-*

*erty*, or *private property* for the protection whereof the government was established. An act of the legislature (for I cannot call it a law) contrary to the *great first principles* of the social compact, cannot be considered a *rightful exercise* of legislative authority. The obligation of a law in governments established on *express compact and on republican principles* must be determined by the *nature* of the *power* on which it is founded.

A few instances will suffice to explain what I mean. A law that punished a citizen for an innocent action, or, in other words, for an act, which, when done, was in violation of no *existing* law, a law that destroys or impairs the *lawful private* contracts of citizens ; a law that makes a man *a judge in his own cause ;* or a law that takes *property* from A. and gives it to B. It is against all reason and justice for a people to entrust a legislature with SUCH powers, and, therefore, it cannot be presumed that they have done it. The *genius*, the *nature* and the *spirit* of our State governments amount to a prohibition of *such acts of legislation*, and the *general principles of law and reason* forbid them. The legislature may enjoin, permit, forbid and punish ; they may declare *new* crimes and establish rules of conduct for *all* its citizens in *future* cases ; they may *command* what is right and *prohibit* what is wrong, but they cannot change *innocence* into *guilt ;* or punish *innocence* as a *crime ;* or violate the right of an *antecedent lawful private contract ;* or the *right of private property*. To maintain that our Federal and State legislature possesses *such powers*, if they had not been *expressly* restrained, would, in my opinion, be a *political heresy* altogether inadmissible in our free republican governments.

In Fletcher vs. Peck, (6 Cranch. 87) Chief Justice Marshall said : " It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power ; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation ?" In Wynehamer vs. The People, (3 Kern 378) where a most elaborate and exhaustive discus-

sion and review of the authorities occurs, it is said by Comstock, Judge, among other things: "I am brought, therefore, to a more particular consideration of the limitations of power contained in the fundamental law; * * * "No person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." These provisions have been incorporated in substance, into all our State Constitutions. They are simple and comprehensive in themselves, and I do not perceive that they derive any additional force or meaning by tracing their origin to *Magna Charta*, and the later fundamental statutes of Great Britain. In *Magna Charta* they were wrested from the king as restraints upon the power of the crown. With us they are imposed by the people as restraints upon the power of the legislature. No doubt, it seems to me, can be admitted of the meaning of these provisions. To say as has been suggested, that " the law of the land," or " due process of law," may mean the very act of legislation which deprives the citizen of his rights, privileges or property, leads to a simple absurdity. The constitution would then mean that no person shall be deprived of his property or rights, unless the legislature shall pass a law to effectuate the wrong; and this would be throwing the restraint entirely away. The true interpretation of these constitutional phrases is, that where rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away; but where they are held contrary to the existing law, or are forfeited by its violation, then they may be taken from him; not by an act of the Legislature, but in the due administration of the law itself, before the judicial tribunals of the State. The cause or occasion for depriving the citizen of his supposed rights must be found in the law as it is, or at least it cannot be created by a legislative act which aims at their destruction. Where rights of property are admitted to exist, the legislature cannot say they shall exist no longer; nor will it make any difference, although a process and a tribunal are appointed to execute sentence. If this is the " law of the land" and " due process of law," within the meaning of the constitu-

tion, then the legislature is omnipotent. It may, under the same interpretation, pass a law to take away liberty or life without a pre-existing cause, appointing judicial and executive agencies to execute its will. Property is placed by the constitution in the same category with " liberty and life."

When speaking of a similar clause in constitution of Pennsylvania, and of the right of property protected by it, Chief Justice Gibson said : " What law ? Undoubtedly a pre-existent rule of conduct, not an *ex post facto* rescript or decree made for the occasion. The design of the convention was to exclude arbitrary power from every branch of the government ; and there would be no exclusion of it if such rescripts or decrees were to take effect in the *form of a statute.* The right of property has no foundation or security but the law, and when the legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen is no more." (Norman vs. Heist, 5 Watts. & Serg. 193.)

Chancellor Kent says : " The better and larger definition of due process of law is, that it means law in its regular course of administration through courts of justice." (2 Kent 13.)

Chief Justice Ruffin, when discussing a clause in the Constitution of North Carolina, similar to the one under consideration, said : " In reference to the infliction of punishment and divesting of the rights of property, it has been repeatedly held in this State, and it is believed, in every other of the Union, that there are limitations upon the legislative power, notwithstanding those words ; and that the clause itself means that such legislative acts as profess in themselves directly to punish persons, or to deprive the citizen of his property without trial before the judicial tribunals, and a decision upon the matter of right, as determined by the laws under which it is vested, according to the course, mode and usage of the common law as derived from our forefathers, are not effectually 'laws of the land' for those purposes." (Hoke vs. Henderson, 4 Dev. 1.) It would scarcely seem necessary so frequently to recur to the meaning of the phrase " due process of law," or its legal equivalent, " law of the land," and

we should not now do so were it not that frequent recurrences to rudimentary and fundamental principles cannot be out of place whenever such recurrence concerns any of the constitutional rights of the citizen. It was customary with the fathers and the earlier writers to make frequent mention of those rights, to regard them as of *primal* and all others of *secondary* importance, to advert to them and their perpetuity as the *chief* end for which *the government, under the constitution,* was established.

Mr. Justice Cooley, in his work, (Const. Lim. 353) says: "Perhaps no definition is more often quoted than that given by Mr. Webster in the Dartmouth College case." "By the law of the land, is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules which govern society. Everything which may pass under the form of an enactment, is not, therefore, to be considered the law of the land."

The definition here given is apt and suitable as applied to judicial proceedings, which cannot be valid unless they "proceed upon inquiry," and "render judgment only after trial." It is entirely correct, also, in assuming that a legislative enactment is not necessarily the law of the land. The words "by the law of the land," as used in the Constitution, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the Constitution into mere nonsense. The people would be made to say to the two Houses: "You shall be vested with the legislative power of the State, but no one shall be disfranchised or deprived of any of the rights or privileges of a citizen, unless you pass a statute for that purpose." In other words, "you shall not do the wrong unless you choose to do it."

In a cause recently decided in Maine, where the legislature had passed an act authorizing the land agent to seize and sell, without legal process, the teams and supplies of alleged trespassers on public lands, it was held that the act was void, both under the State Constitution and under the Constitution of the United States,

which, by the first section of the fourteenth amendment, declares : "Nor shall any State deprive any person of life, liberty or property, without due process of law." And the court there pertinently says : " Where the State undertakes to confiscate a person's property upon the ground that it has been used in committing a trespass upon public lands, something more is necessary than an *ex parte* determination and command of the land agent. It will be noticed that the same protection is secured to property as to life and liberty. Will any one contend, that it is competent for the legislature to pass an act, authorizing the land agent to seize the person of the trespasser upon the public lands, and hang him, or imprison him for life, without any other trial of his guilt than the *ex parte* determination of the land agent himself, and no other authority than his own personal command? Of course not. No more is it competent for the legislature to pass an act authorizing the land agent to deprive a person of his property in such a summary mode ; for what is due process of law in one case must be equally so in the other. In the Constitution, life, liberty and property are all grouped together in one sentence, and the same protection which is secured to one is secured to all." (Dunn vs. Burleigh, 62 Me. 24.) And in a cause still more recently decided by the same court, (City of Portland vs. City of Bangor) it was held in consequence of the amendment just referred to, that a *pauper could not be sent to the work house*, under a warrant signed by two overseers of the poor, on an *ex parte* hearing. " If," says Watson, J., in delivering the opinion of the court, " *white* men and women may be summarily disposed of at the *North*, of course, *black* ones may be disposed of in the same way at the *South* ; thus the very evil, which it was particularly the object of the fourteenth amendment to eradicate, will still exist. The objection to such a proceeding does not lie in the fact that the persons named may be restrained of their liberty, but in allowing it to be done without first having a judicial investigation to ascertain whether the charges made against them are true ; not in committing them to the work house, but in doing it without first giving them an opportunity to be heard." (Cent. L. Jour. Vol. 3, No. 41, p. 651.) In the case at bar,

the law whereon defendants rely, does not at all accord with Mr. Webster's definition. For it is in no sense "*the general law ;*" on the contrary, it is as much a partial and special one, as though in direct terms it had authorized and commanded the seizure which the plea justifies. A provision of the constitution of Vermont requires "that when an issue in fact, proper for the cognizance of a jury, is joined in a court of law, the parties have a right to trial by jury, which ought to be held sacred." And in Plimpton vs. Town of Somerset (33 Vt. 283) the effect of an act for a compulsory reference of suits at law is considered ; and the court there says "holding this suit therefore to be one 'proper for the cognizance of a jury' we are next led to inquire whether the provisions of the act of 1856 do not materially impair the right of trial by jury. The act provides for a trial by commissioners, and for a report of the commissioners, stating the facts they find proved. When this report is made, the court are to render judgment upon it, unless either of the parties shall elect to have a trial by jury. The party electing to have a jury trial, must make a statement in writing of the material particulars in which he expects to change the result of the report. Thereupon a trial by jury may be had, but the statute says ; "At the trial the report shall be *prima facie* evidence of the facts," and " the verdict shall be specifically upon the facts put in issue by the statement in writing." It is in this clause that the infringement of the right is alleged to exist. The mere providing of a preliminary trial by commissioners would not of itself impair the right, so long as the party could appeal from their decision and have a full and fair trial by jury. (Beers vs. Beers, 4 Conn. 535 ; 3 Gray, 476.)

A trial by jury, within the meaning of the Constitution, not only supposes that the controversy between the parties shall be submitted to twelve jurors, but that it shall be submitted to them upon the evidence ; that it shall be submitted to them for their minds to weigh the evidence, unaffected by the opinion or judgment of any other tribunal in regard to it. It is to be a *trial*, the hearing of evidence and argument, and the deciding upon them, not the acting upon conclusions which some other tribunal

has drawn from the evidence and argument. It is to be a *trial* by *jury*. The jurors are to hear for themselves, to use their own judgment, and the verdict is to be the result of their deliberation and reflection upon the testimony and argument. If the judgment of some other body, upon the same matters, is substituted for, and is to control the decision of their minds, their action upon the subject ceases to be a trial and becomes but the mere recording of a verdict made for them by others. If the judgment of another body is so substituted *in part*, the right is impaired to the extent of the substitution. Herein lies the fatal objection to this clause of the statute. By making the judgment of the commissioners *prima facie* evidence, it enables one party to obtain a verdict without any showing whatever at the outset. * * * * This is not "holding the trial by jury sacred." It rather makes it incumbent on the court, in the eloquent language of Judge Blackstone, "to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretenses, may, in time, imperceptibly undermine the best preservative of English liberty." In the present instance the issuance of the military order, as relied on by the plea, is the *all-sufficient and conclusive answer to any action. Its simple issuance* being proven, all other evidence is at once rejected, and all further investigation forthwith ceases. If in Plimpton's case it was violative of the constitutional right of trial by jury to allow the report of commissioners, who, duly appointed and sworn, heard and reported the facts they regarded as proved, to be even *prima facie* evidence of those facts, how much more is that act an invasion of constitutional right, which makes a mere arbitrary military edict a *conclusive bar* to a plaintiff's recovery?

Under the operation of such an act, the jurors have no voice of their own in the matter; but in the expressive language of the case just cited, "*their action upon the subject ceases to be a trial and becomes but the mere recording of the verdict made for them by others.*"

It would seem clear, beyond question, that a law which accomplishes such results must be one which condemns *without* hearing, proceeds *without* inquiry, and renders judgment *without* trial; possessing, in short, all those attributes, and none other than those which pertain to *"legislative judgments and an exercise of judicial power."* (3 Dall. *supra.*) No one would contend, since the adoption of the 14th amendment, above cited, that a State could deprive any citizen of life, liberty or property, but in accordance with the law of the land, without acting in conspicuous violation of the Constitution. Shall it be said that the 14th amendment is binding on the State legislature, while the 5th amendment may be, at pleasure, disregarded by the federal legislature? Surely not. That instrument must apply with equal and controlling potency alike to *all* legislative assemblies, whether State or National, and an act passed by *either* clearly repugnant to the Constitution, must, when brought for review before the courts, unless they indeed prove recreant to their official trust, receive the seal of condemnation and be pronounced void. That the legislatures of the respective States are amenable to the restrictions and prohibitions of the constitution, has been repeatedly adjudged. (Dartmouth College vs. Woodward, 4 Wheat. 518; New Jersey vs. Wilson, 7 Cr. 164; Tenett vs. Taylor, 9 Cr. 43; Town of Pawlett, Id. 292.)

And these restrictions are not confined to the State *legislatures* alone, but the *States* themselves are held bound thereby; preventing them, even by an amendment of their organic law, from interfering with vested rights. (Dodge vs. Woolsey, 18 How. 331.) If the legislature of the *nation* is not thus restrained and prohibited, of what avail or of what force and effect are the most solemnly ordained constitutional guarantees? None, whatever. And if this be so, the result will be that the trinity of human rights, *life, liberty and property*, specially designated in the Constitution as worthy particular protection, will be held not as matters *fundamentally established*, but by the *slender* and *precarious* tenure of the *will and caprice* of the party, which for the time being, bears sway in the councils of the nation. Such a result cannot be, even for a moment, contemplated

without unfeigned dismay. The constitutionality of the act in question, has not, that we are aware of, been directly passed upon by the Supreme Court of the United States, though brought to the attention of that court in Mayor vs. Cooper (6 Wall. 247) and also in Bean vs. Beckwith, *supra*, but in neither case was the point adjudicated. In the latter, the validity of the act of 1863, and that of 1867, was only assumed for the purposes of that case. In some of the State courts, however, the constitutional validity of the act before us has been expressly denied. Thus, in Johnson vs. Jones (44 Ill. 142) where the defendants, Jones and others, sued in trespass for arrest and false imprisonment of the plaintiff, justified, and in their plea alleged, the existence of the rebellion ; that plaintiff was an active member of the "Knights of the Golden Circle," and that defendant Jones, as a United States marshal for the Northern district of Illinois, arrested and conveyed the plaintiff to Fort Lafayette, by the order of the president of the United States. And the court there says : * * "The denial by congress, through a retrospective law, of all redress to a person whose property or liberty was illegally taken under a military order, is a mode of discharging obligations, which, however convenient, is not reconcilable with the principles of the Constitution. The Constitution confides to congress only legislative power, and that to be exercised only for specific purposes. When, therefore, it undertook to determine in 1863 and 1866, that no injury to person or property committed prior to that time, gave to the injured party a vested right of action, if committed under a military order, it assumed a judicial function which it is not authorized to perform. Whether this plaintiff was illegally arrested and imprisoned in 1862, depends solely upon the acts done and the laws in force at the time ; and these are facts to be determined by judicial investigation, and facts which no act of congress can change. If his personal liberty or property was illegally taken from him, then at once accrued to him a right to redress in the courts, which no subsequent act of Congress can take away. The rights of person and property are equally secured by the constitutional provisions borrowed from Magna Charta, that no person shall be

deprived of them without due process of law. That congress has no power, by its own act, to divest these rights, is universally conceded, and we are unable to perceive the difference in principle between an act seeking to divest them directly, and one providing that where they have been divested, by unlawful violence, no remedy shall be had against the wrong doer. Suppose congress should pass a law that no action should lie against a marshal for any illegal acts theretofore done by him under color of his office, and a marshal should be sued for having, before the passage of the law, illegally taken the goods of one person under an execution against another, can it be supposed such an act would be a defense to a suit brought for the trespass? And there is no difference in principle between such legislation and that now under consideration. In 1862, on the facts disclosed by this record, one citizen of Illinois committed a trespass upon the rights of another, for which the laws of Illinois then gave, and now give, a right of action. Since that time congress has said the action shall not be maintained. We must respectfully ask, whence comes the power to interfere with the remedies furnished by the State laws, through the State tribunals, for the injury of one citizen by another? There is, really, nothing to be said in support of this legislation. With all our respect for congress, we must hold these acts beyond its constitutional authority. If they are not so, its power, over person and property, is limited only by its own discretion, and constitutional government is merely a theory." In Indiana a similar result has been reached, and the act of March 3d, 1863, pronounced unconstitutional, where it was attempted to shield a provost marshal under its provisions, who had caused an illegal arrest. (Griffin vs. Wilcox, 21 Ind. 370.)

If the act being considered is unconstitutional, its statutory limitation of actions to two years is wholly unworthy consideration. But the right of Clark accrued under and by virtue of the written lease in 1862. And under our statute then, and still existing, he had ten years wherein to bring his suit after the breach in the covenants in the lease contained. And we emphatically deny that congress possesses the power to overturn

our statutes or interfere with the jurisdiction of our State courts, (Johnson vs. Jones; Griffin vs. Wilcox, *supra;* Bumpass vs. Taggart, 26 Ark. 398, and cases cited), and its powers in this regard were certainly not *enlarged* because of the prevalence of the civil war, to which the act refers. To employ the forcible language of Mr. Justice Davis, in the Milligan case (4 Wal. 2): "The Constitution of the United States is a law for rulers and people, equally in war and peace, and covers, with the shield of its protection, all classes of men at all times, and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man, than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government within the constitution has all the powers granted to it which are necessary to preserve its existence, as has been happily proved by the result of the great effort to throw off its just authority."

To summarize our conclusions in this matter, we regard defendant's plea insufficient, because:

1st. It shows no overwhelming necessity for the act done.

2d. That the law relied on, is, so far as concerns the case at bar, unconstitutional.

3d. That being thus unconstitutional, the two year's bar which it enacts is inoperative, and our own statute of limitations must govern.

4th. That even if the act were in all respects valid, it could not, for the reasons stated, have the slightest applicability to the case before us.

Holding these views, we shall reverse the judgment and remand the cause. All the other judges concur.