CHICAGO, R. I. & P. RY. CO. v. SWANGER, Secretary of State, et al.

(Circuit Court, W. D. Missouri.  January 31, 1908.)

1. COURTS—FEDERAL COURTS—ACTION AGAINST STATE OFFICER—JURISDICTION.

A suit in a federal court to restrain the Missouri Secretary of State from enforcing Laws Mo. 1907, p. 174, requiring him to cancel the license of any foreign railroad corporation to do business in Missouri in case it removed an action brought against it to the federal court, and providing, in addition, a penalty of not less than $2,000 nor more than $10,000 for each offense, with disability to again do business within the state for five years, on the ground that such act was unconstitutional, was not a suit against the state, within Const. U. S. Amend. 11, providing that the judicial power of the United States shall not extend to any suit against one of the United States by citizens of another state, etc.; such an action being construed to be against the state when it involves only penalties, fees, and costs, and property rights are not involved.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 844, 844½.

Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

2. SAME—VALIDITY OF STATE STATUTES.

Under Const. U. S. art. 6, § 2, providing that all executive and judicial officers, both of the United States and of the several states, shall be bound by oath or affirmation to support the Constitution, and that the Constitution of the United States and the laws which shall be made pursuant thereto shall be the supreme law of the land, and that the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding, both federal and state courts have jurisdiction in a proper case to determine originally that statutes of the state and acts of Congress are void as contravening the national Constitution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 820–824.]

3. SAME—STATE COURTS—REVIEW.

The only remedy to correct a decision of the highest court of a state in chancery cases, as well as in actions at law, is by a writ of error to the Supreme Court of the United States.

4. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS.

Laws Mo. 1907, p. 174, providing for the cancellation of the license of a foreign railroad corporation to do business in Missouri in case it removes an action brought against it to the federal courts without the written consent of the opposite party, is unconstitutional, as allowing a resident railway company to sue in the federal court in cases presenting a federal question and denying such right to a nonresident company.

5. SAME—CONFLICT WITH FEDERAL LAWS.

Under Const. U. S. art. 6, § 2, providing that the Constitution and laws of the United States shall be the supreme law of the land, and that the judges in every state shall be bound thereby, notwithstanding the Constitution or laws of any state, Laws Mo. 1907, p. 174, providing for the cancellation of the license of a foreign railroad company to do business within the state in case of its removal of actions brought against it to the federal court without the written consent of the opposite party, was void as infringing the right of such corporation to remove a removable cause conferred by the federal Constitution.

6. SAME—CONTRACT RIGHTS—IMPAIRMENT.

Foreign railroad companies having been induced by Missouri state laws to construct lines and make investments and acquire property within the state, Laws Mo. 1907, p. 174, providing for cancellation of such cor-

porations' rights to do business on their removal of causes to the federal courts without the consent of the opposite party, the enforcement of which would render the corporation insolvent and take from the people of the state the right to use the railway in state business unless the corporation surrendered its right of removal, was unconstitutional, as impairing the corporation's contract rights with the state.

[Ed. Note.—Jurisdiction of federal courts as to laws impairing obligation of contract, see note to Bailey v. Mosher, 11 C. C. A. 316.]

Injunction by the Chicago, Rock Island & Pacific Railway Company, and by six other railway companies, against John Swanger, as Secretary of State of the state of Missouri, and others, to restrain defendant, as Secretary of State, from enforcing Act Mo. March 13, 1907, Laws 1907, p. 174.

M. A. Low and Paul E. Walker, for complainant Chicago, R. I. & P. Ry. Co.

Thomas R. Morrow, for complainant Atchison, T. & S. F. R. Co.

Frank Sebree and W. F. Evans, for complainant St. Louis, K. C. & C. Ry. Co.

Frank Hagerman, for complainant Chicago, M. & St. P. Ry. Co.

E. L. Scarritt, W. C. Scarritt, E. H. Jones, and C. M. Miller, for complainant Chicago & A. Ry. Co.

O. H. Dean, W. D. McLeod, H. C. Timmonds, and O. M. Spencer, for complainant Chicago, B. & Q. Ry. Co.

Frank Hagerman and Kimbrough Stone, for complainant Chicago & G. W. Ry. Co.

Herbert S. Hadley, Atty. Gen., and John Kennish, Asst. Atty. Gen., for defendants.

SMITH McPHERSON, District Judge. All these cases present the same question, and are alike in fact, except with reference to one company which came in the state after 1901, a matter not controlling the decision herein. Subject to that statement, all the companies, either by purchase or construction, between the years 1870 and 1891, became the owners of a line of railroad into and across the state, at an expenditure of many millions of dollars, doing both a state and interstate business. By an act of the Legislature of the year 1870 (Laws 1870, p. 89) it was provided that two or more roads could consolidate, and authorized a road of an adjoining state to build a line into the state, or to buy one already constructed, and thereby form a continuous line. The statute further provided that such nonresident corporation "shall be subject to all regulations and provisions of law governing railroads in this state, and may sue and be sued, in all cases, and for the same causes, and in the same manner as a corporation of the state might be sued." The nonresident corporation in all respects was given the same powers and was made subject to the same burdens as a resident corporation. In 1891 the Legislature enacted that any corporation for pecuniary profit, created under the laws of another state, shall, before allowed to continue in business, file with the Secretary of State a copy of its articles of incorporation, and a statement as to its stock and other matters, pay for and receive a certificate from the Secretary of State showing that it has the right to do business.

The bill of complaint herein attacks the validity of an act of the Legislature of 1907 (Laws 1907, p. 174). Section 1 provides that if any railway corporation created and existing under the laws of any other state, and doing a railway business from one point in this state to another point within this state, shall without the written consent of the other party remove a case from the state court to a United States court, or shall without said written consent institute any suit against a citizen of the state in any federal court, then the Secretary of State shall revoke the license to do business from one point within the state to any other point within the state, both as to passengers and freight, and doing such business shall subject it to a penalty of not less than $2,000 and not more than $10,000 for each offense, which disability shall continue for five years. It is alleged that complainant is about removing a case, and the Secretary will follow that by revoking its right to do business. The defendant contends that this in effect is an action against the state, in violation of the eleventh amendment to the Constitution. The complainant contends that the act of 1907 impairs its contract with the state, and denies it the equal protection of the laws if enforced, and is in contravention of the United States judiciary statutes.

This court is mindful of the criticism by many laymen, as well as by some lawyers, to the effect that United States courts have no right, nor even the power, to decree the invalidity of state statutes. The argument, or rather the talk, is that the people know what they need, and that their representatives in Legislature assembled alone should determine what statutes we must have, and when so determined, and evidenced by legislative enactment, that the courts should not interfere by decree and thereby thwart the legislative will. In other words, Great Britain has the model government. This is a most attractive and persuasive argument to many, and has been from the organization of our government. It was the keynote to the Kentucky and Virginia Resolutions. The all power of the state as against the nation was the argument of the minority in the convention of 1787, and in the convention of the states called to ratify that work. Webster, in his second reply to Hayne, defining it, said:

"I understand the honorable gentleman from South Carolina to maintain that it is a right of the state Legislatures to interfere whenever in their judgment this government transcends its constitutional limits, and to arrest the operation of its laws. I understand him to maintain an authority on the part of the states thus to interfere for the purpose of correcting the exercise of power by the general government, or checking it, and of compelling it to conform to their opinion of the extent of its powers. I understand him to insist that, if the exigency of the case in the opinion of any state government require it, such state government may by its own sovereign authority annul an act of the general government which it deems plainly and palpably unconstitutional. This is the sum of what I understand from him to be the South Carolina doctrine, and the doctrine which he maintains."

Seldom does a court—and particularly an United States court—hold a state enactment void but that the old argument and criticism are made charging the courts with usurpation. And this is not confined to laymen. Lawyers indulge in that kind of talk. An issue of a leading newspaper, recently reporting a convention of Attorneys

General, is the authority for the statement that the point to an address of one member from a state east of the Mississippi river was that the fourteenth amendment is a work of great iniquity, in that it limits the power of the states; that the amendment was adopted for the negro only. And the so-called argument is not made by laymen and lawyers only. There recently appeared from the pen of the Chief Justice of one of the original thirteen states an article denunciatory of the practice of United States courts decreeing statutes void as being in conflict with the Constitution. He is an accomplished lecturer and a writer of fine diction, but he is pressing views with reference to the Constitution wholly at war with the generally prevailing view of lawyers, jurists, and statesmen. Admitting that the doctrine is now well established, he declares it to be an evil to allow or tolerate United States courts holding state statutes void because of a conflict with the Constitution. He builds an argument on an alleged statement of fact, which statement is not a fact, that it was proposed in the convention of 1787, "that the judges should pass upon the constitutionality of the acts of Congress. This was June 5th, receiving the votes of only two of the states." As a statement of history, no greater error can be found in print. The scheme before the convention was to have a council of revision, composed of the executive and of justices of the Supreme Court. In other words, judges should have, with the President, the veto power. That was voted down.

His second statement is that Mercer reflected the views of a majority of the convention when he said "that he disapproved of the doctrine that the judges, as expositors of the Constitution, should have authority to declare a law void. He thought that laws ought to be well and cautiously made, and then be incontrovertible." No doubt Mercer said that, but he did not reflect the views of a majority. Mercer was a delegate from Maryland, and had so little heart in the work that he did not appear in the convention until in point of time the convention was nearly half over; but he appeared in time to oppose the great principles of our government. When the convention was about adjourning, Dr. Franklin, too feeble to talk, gave a paper to James Wilson to read, urging that all objections be put to one side, and begging that every member sign the great instrument. Mercer was not persuaded, and refused to sign. On the same day it was proposed to place the journals in the hands of the President (General Washington), to the end that they might be preserved; and Mercer voted no. The convention having adjourned, Mercer was elected as a delegate to the Maryland convention called to ratify or reject the Constitution, and with a small minority voted against the ratification of the Constitution. Bancroft recites in his history that Washington wrote to Madison as to the efforts made in the Maryland convention to reject the Constitution:

"Chase once more made a display of all his eloquence, John F. Mercer discharged his whole artillery of inflammable matter, and Martin rioted in boisterous language. But no converts were made; no, not one."

All should decline to follow the teaching of Mercer in constitutional law. In contrast with that, it is delightfully refreshing to read from the address of the venerable jurist, Justice Harlan, delivered but a

few weeks since, in upholding the powers of both the states and the nation, insisting that each shall keep within their own limits, to the end that this government may continue to exist; that the states may manage and control all local affairs, but they shall not control commerce between the states, nor impair contracts, nor do many other things prohibited; and that this government may not become as it was under the Articles of Confederation. He said:

"What, let me ask, are some of the grounds upon which the pessimist of these days bases his fears for the safety of our institutions? He persuades himself to believe that the trend in public affairs to-day is toward the centralization of all governmental power in the nation, and the destruction of the rights of the states. If this were really the case, the duty of every American would be to resist such a tendency by every means in his power. A national government for national affairs, and state governments for state affairs, is the foundation rock upon which our institutions rest. Any serious departure from that principle would bring disaster upon the American people and upon the American system of free government. But the fact is not as the pessimist alleges it to be. The American people are more determined than at any time in their history to maintain both national and state rights, as those rights exist under the Union ordained by the constitution * * * The best friends of state rights, permit me to say, are not those who habitually denounce as illegal everything done by the general government, but those who recognize the government of the Union as possessing all the powers granted to it in the Constitution, either expressly or by necessary implication; for, without a general government possessing controlling power in relation to matters of national concern, the states would have no prestige before the world and would be in perpetual conflict with one another. With equal truth it may be said that the best friends of the Union are those who hold that the states possess all governmental powers not granted to the general government, and that are not inconsistent with their own Constitution, or with the Constitution of the United States, or with a republican form of government."

The national and state governments do not conflict. The one or the other has the power to confer all rights needed, and to remedy all wrongs, and to say that neither has such power is to assail our form of government. James Wilson, in a letter to Washington, presented the entire case when he wrote:

"Neither vacancies nor interferences will be found between the limits of the two jurisdictions which together compose, or ought to compose, only one comprehensive system of government and laws."

The views of Justice Harlan and of James Wilson are those entertained by this court.

There is a prevalent notion that United States courts only declare state statutes void, as being in conflict with the national Constitution. All informed men know that the state courts so hold for one, as well as an additional reason, because by article 6, § 3, of the national Constitution it is provided:

"All executive and judicial officers, both of the United States and of the several states, shall be bound by oath or affirmation to support this Constitution."

So that it necessarily follows that state courts, when so persuaded, will not only declare state statutes void when in conflict with the state Constitution, but state courts will declare statutes of Congress void when in conflict with the national Constitution; and all who appreciate our form of government under its written Constitution, knowing that

the general government is one of limited powers, but supreme wherein empowered to act, indorse the right, power, and duty, from which there can be no escape, of all courts to pass upon the validity or invalidity of congressional enactments. State judges take an oath to support the Constitution of the United States, but they do not take an oath to support all congressional enactments. That such has been the practice one need but look at the state decisions. For a partial list of such cases, see More v. Clymer, 12 Mo. App. 11; Clark v. Mitchell, 64 Mo. 564; King v. Insurance Co., 195 Mo. 290, 92 S. W. 892, 113 Am. St. Rep. 678; Latham v. Smith, 45 Ill. 29; Craig v. Dimock, 47 Ill. 308; Bunker v. Green, 48 Ill. 243; Express Co. v. Haines, 48 Ill. 248; Wilson v. McKenna, 52 Ill. 43; Griffin v. Ranney, 35 Conn. 239; Moore v. Quirk, 105 Mass. 49, 7 Am. Rep. 499; Clemens v. Conrad, 19 Mich. 170; Bumpass v. Taggart, 26 Ark. 398, 7 Am. Rep. 623; Wallace v. Cravens, 34 Ind. 534; Moore v. Moore, 47 N. Y. 467, 7 Am. Rep. 466; Davis v. Richardson, 45 Miss. 499, 7 Am. Rep. 732; Griswold v. Hepburn, 63 Ky. 20; Ruffin v. Board, 69 N. C. 498, 510. It will be observed that three of these are Missouri cases. The different holdings were made by the state courts because all state judges, as well as United States judges, are required by article 6, § 3, of the Constitution to take an oath to support the Constitution of the United States, and by reason of that other provision of the same article, which provides:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, * * * shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

And these different state courts as in duty bound gave their respective judgments as to whether congressional enactments were in conflict with the Constitution, and, finding the conflict to exist, upheld the Constitution and decreed the statutes void. And in one case at least—that of Griswold v. Hepburn—the judgment of the Court of Appeals of Kentucky was affirmed by the Supreme Court of the United States. And such holdings should not be otherwise, because, first of all, the Constitution is the supreme law of the land, and next to that are the enactments of Congress, provided, always, such enactments are "pursuant" to the Constitution.

The most attractive argument to some lawyers of recent days is that the state courts alone in the first instance should pass upon the question as to the validity of state statutes, with the right of the defeated party to carry the case for final decree to the Supreme Court of the United States. Such arguments are plausible, are convincing to many good people, but are so dangerous as to amount to a heresy. It is the extreme of "state rights" in a new form. The argument is plausible, because they admit that the final decision should be made by the United States Supreme Court, upholding the national Constitution and overthrowing state legislation, when the two are in conflict. So they argue that the state courts should first pass upon the case, and, if the statute is upheld, the party defeated can have a remedy by writ of error, carrying the case to the national Supreme Court.

A writ of error is for the correction of erroneous rulings in matters of law, and not for a review of questions of fact; and it can be safely predicted that in all cases, including those in equity, taken up by writ of error, the contention will be that all questions of fact will be foreclosed. Such is the rule, and a writ of error in a case turning on questions of fact, concerning which the evidence is in conflict, will be no remedy at all. And the question naturally arises whether such will be the result. If so, then the Supreme Court is practically deprived of power in all such cases, with the result that the conflicting state court decisions will remain in force, instead of having that which is so desirable, viz., a decision by the national Supreme Court on all national questions. The real welfare of this country demands that all questions, of fact as well as of law, pertaining to our national Constitution, be ultimately decided by our national Supreme Court, to which all patriotic citizens should and do yield the most cheerful obedience. That a writ of error to a state court in a chancery as well as in a law case in which the evidence is in conflict will avail nothing, one need but read the case of Egan v. Hart, 165 U. S. 188, 17 Sup. Ct. 300, 41 L. Ed. 680. And see Bement v. National Co., 186 U. S. 70, 83, 22 Sup. Ct. 747, 46 L. Ed. 1058.

The only remedy to correct the decision of the highest court of the state is by writ of error, in chancery cases as well as in actions at law. In a large per cent. of these chancery cases the case turns solely on questions of fact, with reference to which the evidence is in conflict; and an important inquiry is thereby suggested as to whether, if the effort is successfully made to keep litigation involving federal questions in the state courts, depriving the national courts from passing on questions of fact in chancery cases, such party thus desiring a review is not deprived of due process of law. This is a question of great moment, but not now for discussion in this case. It is often urged that cases in the United States courts are too tedious, and that too much time is taken to obtain a final decision. This is an error. Under the equity rules, if either party desires the case be expedited, it can be carried to final decision as quickly, or more so, than in most of the state courts. It is due to counsel for defendant to say that several of the foregoing propositions were not controverted by them in argument. But it has been deemed proper by the court on its own motion to briefly discuss them.

I now turn to the questions presented by the bill of complaint. It is contended that this action, although against a state officer, is in effect a suit against the state of Missouri. The eleventh amendment to the Constitution recites that:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

That the Supreme Court has passed upon this many times is known by all lawyers. But there are no conflicts in the decisions, although in some of the cases against state officers it was held that the actions were in effect suits against the state, and in other cases the decisions

were that the state in effect was not being sued. No one questions the meaning and purpose of the amendment, and no one is in doubt as to the reason for adopting it. The question in every case is as to the facts of the case and as to the relief sought; and in each case as it arises such is the question. It would be wholly academic to now discuss the question further than to mention the two lines of cases. In Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535, and like cases, the holding is that, if penalties and fines and costs only are involved, United States courts cannot take jurisdiction. In the case of M., K. & T. R. R. Co. v. Missouri Commissioners, 183 U. S. 53, 22 Sup. Ct. 18, 46 L. Ed. 78, construing the Missouri statutes, and like cases, the holding always is that if, in addition to fines and penalties, property rights are invaded, an action for relief is not in effect a suit against the state. Suffice it to say that the Missouri statutes have been considered and construed by the Supreme Court. Whatever the decisions have been or may be hereafter from other states, this case is binding on this court sitting in Missouri, construing Missouri statutes, and should be observed until overruled, which is so highly improbable as to merit no consideration; or, if mistaken in this, when expressly overruled will be the time to further consider this.

By article 3, § 1, of the Constitution, it is provided that:

"The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."

By section 2 thereof it is provided:

"The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and to controversies between citizens of different states."

The judiciary act of 1888 covered this with particularity, providing that United States courts shall have jurisdiction in all cases of a civil nature wherein the amount in controversy shall exceed $2,000 in several classes of cases, two of which only need be stated. The one is, in the language of the Constitution, "in an action between citizens of different states." And as to that the uniform holding for many years has been that a corporation shall be regarded as a citizen of the state where incorporated. The other class is that jurisdiction is conferred, both by the Constitution and the act of 1888, regardless of citizenship, "in a case arising under either the federal Constitution or the laws of the United States." So that, if the act of the Missouri Legislature of 1907, hereinbefore referred to, is valid, then no nonresident railway company can have any of its litigation in the United States courts; but a railway corporation organized under the laws of Missouri can bring its actions in such courts against citizens of Missouri, provided such cases "arise under the Constitution or laws of the United States." And it is said that at least three of the trunk lines of road in the state are Missouri corporations. They can bring their cases of the nature referred to in the United States courts; but, if the nonresident companies do that, they are not only subjected to heavy penalties, but the penalties, if enforced, drive them from doing any and all business of a state character. And, if the statute of 1907 is valid, then we have

one of two situations presented: (1) The company must cease doing a state business. Passengers from one point to another point within the state must not be carried; and the same as to freight. Regardless of the fact that local aid may have been voted and donations made for the building of the road, the people along the line can longer have no road, except for interstate and through business with other states, and the contract by the road with the state to perpetually maintain and operate its road is at an end. (2) Or the company must surrender its rights under the Constitution and the statutes of Congress, giving the right to have some of their litigation in the United States courts. There is no escape from the one conclusion or the other; and this presents an important question for decision.

The Missouri statute does not provide that the litigation of nonresident railway corporations shall not be had in United States courts, but provides that, if carried there, its rights of doing business shall cease for five years. An analysis of a few of the decisions of the Supreme Court will lead to the conclusion about which there can be no doubt. In Doyle v. Insurance Co., 94 U. S. 535, 24 L. Ed. 148, there was under consideration a statute of Wisconsin which provided that, if any foreign insurance company removed any case to an United States court, its right to do business in the state should cease. A case having been removed, the company sought to enjoin the revocation of its license and from being ousted from the state. The Supreme Court held the statute to be valid and enforceable. The recent case of Insurance Co. v. Prewitt, 202 U. S. 246, 26 Sup. Ct. 619, 50 L. Ed. 1013, construing a Kentucky statute, is to the same effect. There are many other decisions of like holdings by judges on the circuit, which will not be reviewed. But from these two decisions, and the one so recent, it can be stated that the undoubted rule is that a foreign corporation can be kept out, or excluded when once in, by any state, and this with or without good reason, and for no reason at all. Such is the general rule, but to which there are exceptions, presently to be noticed. In the two cases cited the company had no property in the state, and had made no investments, but had a license to do an insurance business. It is true the company had advertised its business, established agencies, and incurred expenses of those kinds. So that as to a foreign insurance company it is wholly immaterial for what reason the state does not desire it to continue in business. It can be excluded, and the company can have no relief.

The state officers insist that the two cases cited, and those of like holdings, demand at the hands of this court a decree upholding the validity of the Missouri statute in question. The concluding paragraph of the majority opinion of the Doyle Case will arrest the attention of any one investigating the question in all its phases. It was said:

"No right of the complainant under the laws of the Constitution of the United States, by its exclusion from the state is infringed; and this is what the state now accomplishes. There is nothing, therefore, that will justify the interference of this court."

Whether a state can prevent a foreign corporation engaged in interstate commerce from coming in the state will not be here discussed.

An insurance company is not engaged in commerce, and therefore that question was not covered in the cases cited. In the cases at bar a license to do business is not the question. Each of the companies invested millions of dollars, and it is now in the state and cannot remove. To prevent it from doing business, means appropriating its property, or destroying it, without making any compensation therefor. It was invited to come into the state, and was told by the laws then in force that it would have the same and like standing as resident companies, with benefits as great, and with burdens no greater. After these investments had been made, and which cannot be withdrawn, it is declared by legislation that no kind of litigation shall be carried on by it in any court other than the state courts, but leaving to the railway corporation organized under the laws of the state to go to the national courts with its litigation of all kinds arising under the laws or Constitution of the United States. The state corporation, organized under its laws, may sue or be sued in any court, state or national, if there is a federal question; but a foreign corporation doing business as a competitor must at all times be subject to the state courts, or, if it ventures into a national court, then all investors lose all.

The case of Barron v. Burnside, 121 U. S. 186, 7 Sup. Ct. 931, 30 L. Ed. 915, arose under an Iowa statute much like, and in principle the same as, the Missouri statute now being considered. The Supreme Court held the statute to be void. The Iowa statute required a foreign corporation desiring to do or continue in business in Iowa should file with the Secretary of State a resolution designating a person upon whom service should be made, whereupon a permit to do business should be issued. It was further provided that, if any nonresident company should remove a case to the United States court on the ground of diverse citizenship, such permit should be vacated, and not again given a permit for three months, and in the meantime doing business should subject it to large penalties. The decision holding the statute void was by an unanimous court; and the statute was declared void in the following language, not capable of being misunderstood by any one:

"As the Iowa statute makes the right to a permit dependent upon the surrender by the foreign corporation of a privilege secured to it by the Constitution and laws of the United States, the statute requiring the permit must be held to be void."

And the privilege secured to it, which the court was discussing, was the privilege of having its litigation in United States courts. It will be observed that this decision was long after the Doyle Case, and by express mention it was held that the Doyle Case did not control. On the foregoing the case at bar could be safely grounded. But for another reason the statute is void, as being in conflict with the national Constitution, in that it is repugnant to the provision which reads:

"No state shall pass any law impairing the obligation of contracts."

It is stoutly denied that there is any contract, and, of course, there must be a contract before the obligation of one can be impaired. What was the contract? The state gave it the power of eminent domain. In many instances it gave it pecuniary aid. It gave it the rights of

a common carrier. It gave it the right to charge reasonable prices for its services. It promised it the equal protection of the laws as to taxation, and equal protection with others against all who might seek to injure its property or earning power. The state in effect said: "Make your investments, and we will give you these rights." The company accepted the offer and made the investments, and now cannot remove if it so desired, because it has a contract in perpetuity to serve the people as a common carrier and to give efficient service for reasonable remuneration. That there is a contract is easily discerned. And, that being so, the most recent case of all, that of American Smelting Company v. Colorado, 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. 393, is decisive of this phase of the case. Colorado enacted a statute that foreign corporations entering the state should be on an equality with home corporations. While such legislation was in force, the complainant entered the state and made large investments to carry on its business within the state. The Supreme Court of the United States decided that that was a contract between the corporation and the state. After such investments had been made, the state by legislation attempted to require the foreign corporation to pay more taxes than could be exacted from resident corporations, ignoring its promise, by legislation in force when the nonresident corporation went into the state, that the taxes should be equal. The Supreme Court decided that the state was thereby impairing its contract.

From the foregoing the opinion of this court is as follows:

1. The Doyle and Prewitt Cases do not have the slightest application to the case at bar. In those cases property rights were not involved. The mere naked right to a license to do business by a foreign corporation was considered.

2. The Missouri statute of 1907 is void, because it allows a resident company to sue in the federal court, if there is a federal question, and denies that right to a nonresident company.

3. Regardless of the last preceding statement, the statute is void because it seeks to take from the complainant its right to bring or remove a case to the United States court, which right is given by the Constitution and the acts of Congress, which by article 6, § 2, of the Constitution is declared to be "the supreme law of the land, anything in the Constitution or laws of any state to the contrary notwithstanding."

4. The statute is void, because it is an effort to impair and to repudiate the contract of the state, made with the company, by which it was induced to come into the state, making investments in large sums, and was authorized to do a state business, but now declaring that it shall not do such business, thereby rendering it insolvent, and taking from the people along its line the use of a railway for state business, unless the company will surrender under coercion rights given it by the national Constitution and valid enactments of Congress.

This court recognizes the rule that presumptively all legislation is valid; but it is only a presumption, and in no sense conclusive. This court recognizes that all doubts should be solved in favor of upholding legislation; but there are no doubts in this case. This court recog-

nizes that the Secretary of State will be enjoined from doing that which he is commanded to do by state legislation; but it is also well known that, if this court is in error, there can be a reversal by the Supreme Court within less than a year of time. There is but a single question presented. The complainant asserts rights under the national Constitution and laws enacted by Congress. The defendant asserts rights under an act of the Missouri Legislature, and insists that there is no conflict. This court holds that there is a conflict, and, there being a conflict, the one or the other must give way; and, the Constitution and laws of Congress "being the supreme law of the land," as of course the enactments of the state must yield.

The defendant's demurrer to the bill of complaint is overruled, and, as he declines to plead further, a final decree will be entered as prayed, perpetually enjoining him and his successors from attempting to give force to the Missouri statute which seeks to prohibit the railway company from doing business within the state, if it seeks to have any of its litigation in the United States courts.