ST. LOUIS & S. F. R. CO. v. CROSS, Secretary of State of Oklahoma, et al.

(Circuit Court, W. D. Oklahoma. June 4, 1909.)

No. 278

1. COURTS (§ 314*)—JURISDICTION OF FEDERAL COURTS—CITIZENSHIP OF CORPORATION.

  The fact that foreign corporations licensed to do business in a state are declared by statute to be domiciled in such state for all purposes does not make such a corporation a citizen of that state so far as to affect the jurisdiction of the federal courts upon the question of diverse citizenship.

  [Ed. Note.—For other cases, see Courts, Cent. Dig. § 860; Dec. Dig. § 314.*

  Diverse citizenship as ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.

  Jurisdiction over corporations, see note to St. Louis, I. M. & S. Ry. Co. v. Newcom, 6 C. C. A. 174.]

2. RAILROADS (§ 142*)—EFFECT OF SALE OF ROAD TO FOREIGN CORPORATION—CONSOLIDATION—OKLAHOMA STATUTE.

  Under the statute of Oklahoma Territory (Wilson's Rev. & Ann. St. 1903, § 1067), which authorized any railroad company owning any railroad in the territory to sell or lease the same to any other railroad company, domestic or foreign, and provided that the purchasing or leasing company "shall possess and enjoy all the rights, powers, privileges and franchises conferred by the laws of this territory upon a railroad corporation formed thereunder," such a purchase did not effect a merger or consolidation

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

of the two companies, so as to constitute a new domestic corporation, which is separately provided for by section 1028 of the same statutes.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 444; Dec. Dig. § 142.*]

**3.** COURTS (§ 303*)—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.
Where officers of a state assuming to act under an unconstitutional statute, or under a valid law, but going beyond the powers thereby conferred, threaten to commit an act of wrong and injury to the rights and property of another, a suit to enjoin them is not one against the state, and for that reason without the jurisdiction of a federal court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 844½; Dec. Dig. § 303.*

Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

**4.** COURTS (§ 259*)—JURISDICTION OF FEDERAL COURTS—NATURE AND SOURCE.
The right to resort to the jurisdiction of the federal courts, including the right of removal thereto, is one conferred by the federal Constitution and the laws of Congress enacted in pursuance thereof that cannot be impaired or abridged by any statute of a state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 795; Dec. Dig. § 259.*]

**5.** CONSTITUTIONAL LAW (§§ 130, 303*)—OBLIGATION OF CONTRACTS—IMPAIRMENT BY STATE—REVOCATION OF LICENSE OF FOREIGN CORPORATION—DUE PROCESS OF LAW.
A railroad company which at the time of the admission of Oklahoma as a state, was the owner of railroad lines therein, acquired at a large expenditure for construction and purchase, under the sanction of the laws of the territory of Oklahoma, and of Congress relating to the Indian Territory, was vested thereby with contract rights within the protection of the state Constitution, Schedule 1, which provides that existing rights and contracts shall continue unaffected by the change in form of government, and also within the protection of the contract clause of the federal Constitution, and as applied to such company Act Okl. May 26, 1908 (Laws 1908, p. 214, c. 16), providing in effect that on the filing by any foreign corporation of a petition for the removal of any suit into a federal court on the ground that it is a citizen of another state or country, it shall forfeit its right and license to do business in the state, which shall at once be revoked, is unconstitutional and void both as impairing the company's contract rights and as depriving it of its property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 301, 863; Dec. Dig. §§ 130, 303.*]

**6.** CONSTITUTIONAL LAW (§ 23*)—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—RETROACTIVE EFFECT.
Const. Okl. art. 9, § 31, which provides that no foreign railroad company shall be entitled to the benefit of eminent domain in the state until it shall incorporate under the laws of the state, is not retroactive and does not affect the right of a foreign railroad company to the use and enjoyment of its right of way previously lawfully acquired.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 20; Dec. Dig. § 23.*]

**7.** CONSTITUTIONAL LAW (§ 23*)—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—RETROACTIVE EFFECT.
Const. Okl. art. 9, §§ 8, 9, regulating the right of foreign corporations to lease or purchase parallel or competing railroad lines and to consolidate with domestic corporations, do not apply to past transactions.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 20; Dec. Dig. § 23.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. INJUNCTION (§ 22*)—ACTIONS FOR INJUNCTIONS—JURISDICTION.

In a suit in a federal court to enjoin a state officer from proceeding under an alleged unconstitutional statute to revoke the license of complainant, a foreign corporation, to do business in the state, it is not a defense that the order of revocation was signed before the restraining order became effective or was served on the defendant, where it was after the suit was begun and the court had acquired jurisdiction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 19; Dec. Dig. § 22.*]

## In Equity.   On demurrer to amended bill.

The amended bill contains allegations, as follows:

That the complainant is a corporation organized and existing under the laws of the state of Missouri and a citizen of that state, and that the defendants are citizens of the Western district of the state of Oklahoma. That the matters in dispute exceed $5,000. exclusive of interest and costs, and that the cause arises under the Constitution and laws of the United States. That the complainant has for several years owned and operated, and now owns and operates, a system of railroad as a common carrier of freight, passengers, and mail between, in, and through, the states of Missouri, Kansas, Oklahoma, Arkansas, Tennessee, Mississippi, and Alabama. That the portion of said railway system in Oklahoma is composed of 16 lines of railway, of the aggregate length of 1500 miles, which were constructed between certain named termini by other railroad companies, under and by the authority of and in compliance with certain designated acts of Congress and the statutes of Oklahoma Territory (some of the lines being located in both Oklahoma and Indian Territories and others in each of them), and thereafter with all of their property, franchises, etc., acquired by the complainant by deeds of conveyances (2 of them being made by purchasers at foreclosure sales, 12 by the original companies, and 2 by intermediate grantees, in one instance a lease being made), all prior to the admission of the state, and at all times since so acquired forming a part of a continuous and connecting line of interstate railway, on which since completion and acquirement by complainant it has been carrying interstate and intrastate commerce and the mail. That by the laws of Congress and the territory of Oklahoma and said conveyances, valid contracts were made whereby the complainant acquired the right to operate and maintain said railroads. That the laws of Congress and the territory of Oklahoma invited the investment of capital in railroad enterprises, and that pursuant to the invitations, offers, and conditions contained in such laws, the complainant has invested many millions of dollars in these railroads; its property being assessed for the current year at $47,266,311. That by virtue of such laws and the investments thereunder, the complainant has acquired the right by contract to continue to own, maintain, operate, and enjoy such railroads and possess and enjoy the rights of a common carrier of interstate and intrastate commerce as well as all the rights, privileges, and franchises of corporations organized under the laws of the territory of Oklahoma. That, not being so required, complainant has not procured a license from the territory or state of Oklahoma to transact business in the state, but has carried on its business as such common carrier in the state under the authority of the laws in force at the time of the organization of the state (on November 16, 1907) and the Constitution of the state, so far as applicable.

That in a civil action instituted against it in the district court of Comanche county, in this state, for the recovery of damages sustained prior to the admission of the state, the complainant filed a petition with bond, for the removal of the action to the Circuit Court for this district, and that the presiding judge of the state court certified the fact to the Secretary of State, whereupon the defendant Leo Meyer, Acting Secretary of State, after this suit was begun in this court, signed an instrument as follows:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"State of Oklahoma.

"Revocation of Charter of St. Louis & San Francisco Railroad Company in Oklahoma.

"Guthrie, Oklahoma, August 29, 1908.

"Petition for removal and to the Circuit Court of the United States.

"Gertrude Goode, Administratrix of the estate of Frank R. Goode, Deceased, Plaintiff, v. St. Louis & San Francisco Railroad Company, a Corporation, Defendant.

"State of Oklahoma, Comanche County, in the District Court.

"Having received due and legal notice from J. T. Johnson, judge of the district court of Comanche county, that the above-named corporation defendant, St. Louis & San Francisco Railroad Company, has filed a petition for removal to the United States court, a certified copy of which is on record in the office of the Secretary of State at the Capitol in the city of Guthrie in the state of Oklahoma: Therefore I, Leo Meyer, Assistant Secretary of State and now Acting Secretary of State of the state of Oklahoma, by authority invested in me under section four of House Bill No. 131 approved by the Governor of the state of Oklahoma, C. N. Haskell, May 26, 1908, do hereby declare the license of the said St. Louis & San Francisco Railroad Company to transact business in the state of Oklahoma forfeited and revoked.

"In testimony whereof, I have set my hand and cause to be affixed the great seal of the state.

"Done at the city of Guthrie this twenty-ninth day of August, A. D. 1908.
"Leo Meyer, Acting Secretary of State.  [Seal.]"

That the defendants have by said instrument attempted to declare the charter and authority of complainant to do business within the state of Oklahoma to be revoked and forfeited, and since the date of the instrument have been and are threatening and attempting to deprive it of the right to do business in the state under and by virtue of the legislative act of the state, approved May 26, 1908, and that the effect of that instrument, unless declared void, and the proposed action of the defendants in attempting to enforce the provisions of the act will be to subject complainant to numerous prosecutions and annoying litigation, and make possible the assessment by various courts of the state of fines, ranging from $1,000 to $5,000, for each day or part thereof during which complainant transacts business in the state. That the complainant is without remedy at law, and that the injury and damage to result from the enforcement of the act are irreparable.

The complainant then asserts that the legislative act of the state is void for conflict with the Constitution of the United States on several specified grounds and with the Constitution of the state, and prays a decree enjoining the defendants from forfeiting or revoking, or declaring forfeited or revoked, or attempting to forfeit or revoke, its authority or charter to carry on its business as a common carrier in the state, declaring the legislative act void and ineffective as to complainant and the instrument signed and issued by the defendant Leo Meyer, Acting Secretary of State, null and void and inoperative as to the right of complainant to carry on such business in the state.

The legislative act of the state (Laws 1908, p. 214, c. 16) complained of is as follows:

"An act fixing the domicile of persons, firms and corporations transacting business within the state of Oklahoma; providing for forfeiture and revocation of license to transact business in the state upon the filing in any court of record, claim or declaration of domicile in another state or foreign country; the duty of judges relative thereto; and providing penalty for transacting business after revocation of license.

"Be it enacted by the people of the state of Oklahoma:

"Section 1. That the domicile of every person, firm or corporation conducting a business in person, by agent, through an office, or otherwise transacting business within the state of Oklahoma, and which has complied with

or may comply with the Constitution and laws of the state of Oklahoma, shall be for all purposes. deemed and held to be the state of Oklahoma.

"Sec. 2. That the license or charter to do business within the state of Oklahoma of every person, firm ·or corporation conducting a business in person, by agent, through· an· office or otherwise transacting business within said state of Oklahoma, who shall claim or declare in writing before any court of law or equity within said state of Oklahoma, domicile within another state or foreign country, shall, upon such declaration be immediately revoked.

"Sec. 3. That it shall be the duty of the judge of any court in which any declaration or claim of domicile within another state· or foreign country, is filed, to report to the Secretary of State and to furnish said Secretary of State with an authenticated copy of any claim or declaration in writing made or filed, declaring domicile within another state or foreign country.

"Sec. 4. That the Secretary of State immediately upon the receipt of the copy of the claim or declaration of any person, firm or corporation as aforesaid, shall declare the license or charter of any person, firm or corporation so filing said claim or declaration, forfeited and revoked.

"Sec. 5. That any person, firm or corporation conducting a business in person, by agent, through an office, or otherwise transacting business within the state of Oklahoma, whose license to do business within said state of Oklahoma shall have been revoked as aforesaid, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than one thousand dollars ($1,000.00). nor more than five thousand dollars ($5,000.00) for each day or part thereof they shall so conduct a business after the revocation of their license to do business within this state as aforesaid.

"Sec. 6. Nothing in this act shall be construed to allow any corporation organized under the law of any other state, territory or foreign country to exercise the right of eminent domain in the state of Oklahoma.

"Sec. 7. An emergency is hereby declared to exist, whereby the immediate passage of this act is declared necessary for the preservation of the public peace and safety, and this act shall be in full force and effect upon its passage and approval.

"Approved May 26, 1908."

W. F. Evans, Flynn, Ames & Chambers, and R. A. Kleinschmidt, for complainant.

Charles West, Atty. Gen. of the State of Oklahoma, M. Fulton, and Charles Mitschrich, for defendants.

COTTERAL, District Judge (after stating the facts as above). The question of the jurisdiction of this court calls for first consideration. It must be held that diversity of citizenship is sufficiently alleged. The complainant is incorporated under the laws of the state of Missouri, and the defendants are citizens of the state of Oklahoma. The first section of the legislative act by its terms fixes the domicile in the state of every corporation transacting business in the state which complies with its Constitution and laws. It is not clear whether the complainant has complied therewith. If it be assumed that it has done so, as contemplated in this act, still it remains a foreign corporation so far as the jurisdiction of the federal courts is concerned. A similar statute was construed in the case of Southern Railway Co. v. Allison, 190 U. S. 326, 23 Sup. Ct. 713, 47 L. Ed. 1078, where it was held that by compliance with the same a corporation "may be made what is termed a domestic corporation, or in form a domestic corporation," but that it does not thereby become a citizen of the state "so far as to affect the jurisdiction of the federal courts upon a question of diverse citizenship."

But it is insisted that the domestication of the complainant was effected by virtue of its consolidation with one or more of the lines of railroad now a part of its system and the formation of a new corporation, under the statutes of the territory of Oklahoma. Wilson's Rev. & Ann. St. 1903. If the complainant became a corporation of the territory, it is a corporation of the state. Kans. Pac. v. Atchison R. R., 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794. The fact alleged is that the complainant acquired this property by means of deeds of conveyance, after the adoption of section 1067 of those statutes in 1899. Section 1028 was adopted in 1890.

The argument is that both sections should be construed together, and that they authorize consolidation and the formation of a new corporation only, and that this was the necessary result of the transfers. Section 1028 provides that a railroad corporation may consolidate its stock, franchises, and property with any other railroad corporation, whether within or without the territory, when they can be lawfully connected and operated together, etc., upon agreed terms by any name selected, which within the territory shall possess all the powers, franchises, and immunities, and be subject to all the liabilities, etc., of domestic corporations, etc.; the articles to be approved by the vote or assent of stockholders as specified, and a copy of the articles and the record of the proceedings to be filed with the Secretary. It further provides that any railroad corporation whose line is wholly or in part within the territory, whether chartered by or organized under the laws of the territory, or of any state or territory, or of the United States, may lease or purchase and operate the whole or any part of any other railroad, together with the franchises, powers, etc., when the roads may be lawfully connected or operated together, constituting a continuous line, etc., provided that the capital stock of the company formed by such consolidation shall not exceed the sum of the capital stock of the consolidating companies at par value, etc. Section 1067 provides that any railroad company owning any railroad in the territory (the words "and any railroad company organized under the laws of this territory owning a line of railroad either within or without the territory" being added by the amendment of 1901 [Laws 1901, p. 86, c. 11, art. 4, § 1]), may sell or lease its railroads, etc., or any interest therein, with all the property, rights, privileges, and franchises thereto pertaining to any other railroad company of the territory, or of any state or territory, or of the United States, the lines being continuous, etc., "which such purchasing or leasing company shall have the right by contract or otherwise when completed to use or operate," and that any railroad company of the territory or of any state or territory, or of the United States, purchasing or leasing a railroad in the territory," shall possess and enjoy all the rights, powers, privileges, franchises conferred by the laws of this territory upon a railroad corporation formed thereunder."

It is not apparent why the two sections, even if they should be treated as parts of one act, do not provide for different transactions, one a consolidation of railroad property and the formation of a new local corporation, and the other a conveyance of the railroad property, fran-

chises, etc. That each may be separately accomplished cannot be gain-said, and, if so, it seems clear that this is what the Legislature intended. No reason appears for the additional legislation contained in section 1067, if only consolidation and a new corporation were to be authorized, because section 1028 is complete in its terms; but section 1067 is silent as to any consolidation or merger, and as to any dissolution, or abandonment of corporate existence of the former corporations, providing practically for the transfer and right of operation, etc., and is likewise complete. With respect to the claim of a different meaning, it may be said to be equivalent to the statute construed in the case of St. Louis & San Francisco Ry. v. James, 161 U. S. 545, 16 Sup. Ct. 621, 40 L. Ed. 802, where it was held that a purchase under its provisions "by the Missouri corporation did not convert it into an Arkansas corporation." See Louisville & Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081. The theory that a consolidation was made and a new corporation was formed by these transfers of the railroad property, franchises, etc., cannot be accepted.

However, complainant sets out another independent ground of jurisdiction—a controversy arising under the Constitution and laws of the United States. City Railway Co. v. Citizens' R. R. Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114. Upon either ground—that is, diverse citizenship, or a controversy arising under the federal Constitution or laws—an amount in dispute, exceeding $2,000, exclusive of interest and costs being also alleged, the case falls within the provisions of Judiciary Act Aug. 13, 1888, c. 866, 25 Stat. 433 (U. S. Comp. St. 1901, p. 508). U. S. v. Sayward, 160 U. S. 493, 16 Sup. Ct. 371, 40 L. Ed. 508.

The state being entitled to immunity from suit, objection is made to the jurisdiction of the court on the ground that the suit is one against the state. The question whether, when state officers are defendants, the suit is against the state, has been the subject of frequent decisions by the courts. The only difficulty in a given case lies in the application of the principles which have been judicially settled. The test is not always whether the state is named as a party. It may virtually be the real party, if its officers are sued as representing the state's action or liability. In such case, or where the officers proceeded against are charged with no duty relative to the statute which is assailed, the suit may not be maintained; but where the officers, under color of an unconstitutional statute, or assuming to proceed under a valid law, but going beyond the powers thereby conferred, threaten to commit an act of wrong and injury to the rights and property of another, a suit to enjoin them is not a suit against the state. Pennoyer v. McConnaughey, 140 U. S. 10, 11 Sup. Ct. 699, 35 L. Ed. 363; Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Fitts v. McGee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932. The same objection was overruled in the recent cases of C., R. I. & P. Ry. Co. v. Ludwig (C. C.) 156 Fed. 152, and C. R. I. & P. Ry. Co. v. Swanger (C. C.) 157 Fed. 783. The authorities justify the conclu-

sion that the suit is not one against the state, and the holding of this court will be to that effect.

It will be observed that the forfeiture and revocation provided by the legislative act are rested upon but one cause—the fact of a written declaration in a court of the state of a domicile in another state. Evidently the act is aimed against the removal of causes from the state courts to the federal court on the ground of diversity of citizenship, because it is based on the assertion in court of a fact necessary to secure such removal. This is conceded; but does such removal of a case to a federal court furnish any justification for the consequences of the act? It is claimed, in substance, as understood by the court, that the act is a rightful exercise of police power, based not on any specific authority to that effect, but upon precedents declaring analogous principles, and that inasmuch as residents and nonresidents had in the former territories the right of litigation only in the courts thereof—in the Indian territory in the United States courts and in Oklahoma Territory in the territorial courts—no right of removal being there enjoyed, the state could, on a basis of nondiscrimination, by this means, put all litigants on a parity and confine their litigation to its courts. The police power of the state, it is true, is a broad and extensive power. It is the power "to prescribe regulations to promote the health, peace, morals, education, and good order of the state, develop its resources, and add to its wealth and prosperity." Barbier v. Connelly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. But plainly the notion that the subject of federal jurisdiction is within the limits of that power is a mistake. The right to resort to the jurisdiction of the federal courts, including the right of removal thereto, is a constitutional right conferred by the federal Constitution and the laws of Congress enacted in pursuance thereof. It is an absolute right that cannot be impaired or abridged by any statute of a state. Barrow Steamship Co. v. Kane, 170 U. S. 100, 18 Sup. Ct. 526, 42 L. Ed. 964; Butler Bros. v. U. S. Rubber Co., 156 Fed. 15, 84 C. C. A. 167. The right to litigate in the federal courts of this state has no qualification annexed; but it is the same as in the other states. Enabling Act June 16, 1906, c. 3335, § 13, 34 Stat. 275 (U. S. Comp. St. Supp. 1907, p. 149). And, furthermore, it is competent for Congress in exerting its constitutional power to vest the federal courts of a state with the jurisdiction of proper cases theretofore pending in the territorial courts. Koenigsberger v. Richmond, 158 U. S. 48, 15 Sup. Ct. 751, 39 L. Ed. 889. The supposed cause assigned in the act is therefore quite the opposite of any support for its operation.

Nor is the legislative act to be vindicated upon any reserved power of repeal of former legislation. It is quite unnecessary to consider whether, or to what extent, any such power may be vested in the Legislature, inasmuch as it has not attempted to act in the only manner given to it, namely as "that no injustice shall be done to the incorporators." State Const. art. 9, § 47; Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102; Noble State Bank v. Haskell (Okl.) 97 Pac. 602.

It is therefore to be determined whether the act may be upheld against the complainant upon the ground which is insisted upon that

it is a proper exercise of discretionary legislative power. Undoubtedly it is a general rule that foreign corporations enter a state to carry on business therein by comity only, and that a state may at will exclude them, admit them on conditions, or terminate its permission once given to continue such business. In the cases of Doyle v. Insurance Co., 94 U. S. 535, 24 L. Ed. 148, and Security Mut. Life Ins. Co. v. Prewitt, 202 U. S. 246, 26 Sup. Ct. 619, 50 L. Ed. 1013, it was held that, while a state may not exact in advance an agreement from a foreign insurance corporation that it will not remove a case to the federal court, yet it may make such removal the contingency upon which the expulsion is to take place. In the latter case it was said:

"A state has power to refuse permission to a foreign insurance company to do business at all within its confines, and as it has power to withhold that permission once given, without stating any reason for its action, the fact that it may give what some may think a poor reason or none for a valid act is immaterial."

But that there is an important qualification on the legislative power of a state in dealing with foreign corporations is pointed out in the former case, where it was said:

"No right of the complainant under the laws or the Constitution of the United States, by its exclusion from the state, is infringed; and this is what the state now accomplishes. There is nothing therefore that will justify the interference of this court."

By the Constitution of the United States it is provided that no state shall impair the obligation of contracts or deprive any person of property without due process of law. Upon these grounds, among those relied upon, the complainant maintains that the legislative act enforced against it infringes its constitutional rights.

The rights asserted by the complainant had their origin prior to the admission of the state. The standing to be accorded those rights is well settled. The Indian Territory was not an organized territory, but Oklahoma Territory was provided with territorial government by its organic act of May 2, 1890. Without question, the United States had entire dominion and sovereignty, national and and municipal, and federal and state, over both territories. American Insurance Co. v. Canter, 1 Pet. 511, 7 L. Ed. 242; Shively v. Bowlby, 152 U. S. 48, 14 Sup. Ct. 548, 38 L. Ed. 331; Mormon Church v. U. S., 136 U. S. 42, 10 Sup. Ct. 792, 34 L. Ed. 478. And the included legislative power over these territories possessed by the states Congress was authorized to intrust to the territorial Legislature, subject to such limitations on its exercise as Congress might impose and to abrogation by it in its discretion. The legislative power of Oklahoma Territory was by section 6 of its organic act extended "to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States," etc. That power was coequal with that of a state within its limits. Simms v. Sims, 175 U. S. 168, 20 Sup. Ct. 58, 44 L. Ed. 115. In keeping with its authority, Congress could lawfully exercise the power of eminent domain in the territories and confer upon a corporation of any state or territory the right to construct and operate a railroad within the territories. Cherokee Nation v. Kansas Railway Co.,

135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. 336, 27 L. Ed. 201; California v. Southern Pac. Ry. Co., 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150; St. Paul v. Phelps, 137 U. S. 528, 11 Sup. Ct. 168, 34 L. Ed. 767. A state Constitution is itself a law within the meaning of the contract clause of the federal Constitution. New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 672, 6 Sup. Ct. 252, 29 L. Ed. 516; Fisk v. Jefferson, 116 U. S. 133, 6 Sup. Ct. 329, 29 L. Ed. 587. The state of Oklahoma, organized upon the domain of the two territories, has provided by its Constitution that existing rights and contracts shall continue un-affected by the change in the forms of government. Schedule, § 1. The rights and contracts so far as shown by the complainant and originating before the admission of the state must be considered as preserved thereafter in their original integrity. Trustees of Vincennes v. State, 14 How. 268, 14 L. Ed. 416; Rogers v. Burlington, 3 Wall. 663, 18 L. Ed. 79; Smith v. Atchison (C. C.) 64 Fed. 272.

By certain acts of Congress a portion of the original constructing companies were granted the right to acquire and appropriate rights of way and to build, maintain, and operate their railroads, or were granted rights of way for the purpose of exercising those rights. Terms and obligations were imposed by these acts which are variant and not common to all; but among them may be mentioned special regulations respecting the acquirement of rights of way and payment therefor, obligations in the way of payments to Indians, liability to taxation for their benefit by Congress and the state, regulations with respect to transportation privileges and charges, local and foreign, crossings, carriage of the mails, etc. The rights of the remaining companies accrued under the laws of Oklahoma Territory, which extended generally the authority to construct and operate connecting railroads. Upon the faith of these laws, which were duly accepted, great outlays of capital were made in building and equipping these lines; the railroad property being largely permanent and immovable, and the use of the property being its chief value—a component part of it and inseparable from it. By the laws of Oklahoma Territory also the purchase of railroads and franchises and the operation of such railroads by both domestic and foreign companies with connecting lines were expressly authorized. In the most of the cases, the original acts of Congress, by direct and indirect provisions, authorized the transfer of the corporate property and franchises of the constructing companies in the Indian Territory. It is alleged that these various lines with the accompanying franchises were transferred to the complainant, and that the purchases were made in consideration of great investments of capital, pursuant to the invitations, offers, and conditions of the federal and territorial laws. There is controversy relative to the legislative authority for the sale and purchase of a part of the property and franchises of the constructing companies in the Indian Territory, but none in Oklahoma Territory. Such controversy, however, need not be entered upon or decided. The proposal of the defendants under the legislative act here assailed is to put an end to the entire right of the complainant to carry on business in the state.

If the complainant has any right to continue business. in the state, a case has been stated for relief. So far therefore as the complainant relies upon an impairment of contract obligations, such controversy may be eliminated.

In view of the legislation and transactions referred to, did complainant secure a "license or charter" for the conduct of railway operations within the state, of such character that it was subject to forfeiture and revocation by the Legislature at will without any cause, resulting in a great depreciation of the railroad property and visiting an enormous loss upon all holdings and interests therein, and at the same time working an incalculable inconvenience and injury to the public, desirous or in need of the facilities of railway transportation and travel over this railroad in the state? Or did complainant enter into such contracts now binding upon the state that the proposed termination of its right to continue its railway business and the use of its property within the state infringes its constitutional rights by impairing the obligations of those contracts and depriving it of its property without due process of law?

Whether the complainant be considered as having succeeded by transfer to direct grants made to the original companies of the right to construct, own, and operate their railroads and standing precisely in their relation to the state, or as having accepted and made its investments upon the faith of the proposals extended generally or specially by statutes conferring the same right upon it as a purchasing company, is not of consequence. In the light of the authorities, the same result was accomplished, and contracts were made. As was said in the case of Reagan v. Farmers' L. & T. Co., 154 U. S. 392, 14 Sup. Ct. 1047, 1052, 38 L. Ed. 1014:

"In the famous Dartmouth College Case, 4 Wheat. 518, 4 L. Ed. 629, it was held that the charter of a corporation is a contract protected by that clause of the national Constitution, which prohibits a state from passing any law impairing the obligation of contracts. The International & Great Northwestern Railroad Company is a corporation created by the state of Texas. The charter which created it is a contract whose obligations neither party can repudiate without the consent of the other. All that is within the scope of this contract need not be determined. Obviously, one obligation assumed by the corporation was to construct and operate a railroad between the termini named; and, on the other hand, one obligation assumed by the state was that it would not prevent the company from so constructing and operating the road."

And in the case of New Jersey v. Yard, 95 U. S. 104, 24 L. Ed. 352:

"Unless forbidden by some exceptional constitutional provision, the same authority which can make a law can repeal it. The Constitution of the United States has imposed such a limitation upon the legislative power of all the states by declaring that no state shall pass any law impairing the obligation of a contract. * * * It has become the established law of this court that a legislative enactment, in the ordinary form of a statute, may contain provisions which, when accepted as the basis of action by individuals or corporations, become contracts between them and the state within the protection of the clause referred to of the federal Constitution."

In the case of Home of the Friendless v. Rouse, 75 U. S. 430, 19 L. Ed. 495, where it appeared that, in order to encourage the establishment of a charitable institution, it was provided by the statute

creating it that its property should be exempt from taxation, and under a subsequent provision of the Constitution of the state, a levy for taxes was about to be made, it was held:

"There is no necessity of looking for the consideration for a legislative contract outside of the objects for which the corporation was created. These objects were deemed by the Legislature to be beneficial to the community, and this benefit constitutes the consideration for the contract, and no other is required to support it. * * * We are of the opinion that the state of Missouri did make a contract on sufficient consideration with the Home of the Friendless, to exempt the property of the corporation from taxation, and that the attempt made on behalf of the state through its authorized agent, notwithstanding this agreement to compel it to pay taxes, is an indirect mode of impairing the obligation of the contract, and cannot be allowed."

In the case of Powers v. Detroit & Grand Haven Ry., 201 U. S. 559, 26 Sup. Ct. 556, 558, 50 L. Ed. 860, a statute of Michigan was upheld which limited the taxes upon a railroad. The court said:

"Surely no clearer case of contract can be presented than one in which a Legislature passes an act in respect to a particular corporation making special provision concerning taxation, and does so with a view of inducing large expenditures by the corporation and the completion of an unfinished road, whose completion is deemed of great importance, and where the special provision is, as required, formally accepted, the expenditure made, and the road completed."

In the case of Erie Railroad v. Pennsylvania, 153 U. S. 642, 14 Sup. Ct. 952, 957, 38 L. Ed. 846, the railroad company, incorporated in New York, was by the Acts of 1841 (P. L. 28) and 1846 (P. L. 179) of Pennsylvania, granted the authority to build partly in Pennsylvania its line projected from New York to Lake Erie, and certain terms, conditions, payments, and taxes were imposed. By Laws 1885 (P. L. 194) § 4, an additional tax on its indebtedness to residents of the state was required, and the Supreme Court of the United States, reversing a judgment of the state court upholding this tax, held:

"We are of the opinion that the fourth section of the Laws of 1885, in its application to this railroad company, impairs the obligation of the contract between it and Pennsylvania, as disclosed by the acts of 1841 and 1846, and by what was done by that company upon the faith of those acts. * * * Consistently with those terms and conditions, Pennsylvania cannot withdraw the assent which it gave, upon a valuable consideration, to the construction and operation of the defendant's road within its limits. Nor can the right of the company to enjoy the privileges so obtained be burdened with conditions not prescribed in the acts of 1841 and 1846, except such as the state, in the exercise of its police power for purposes of taxation, and for other public objects, may legally impose in respect to business carried on said property situated within her limits."

In American Smelting Co. v. Colorado, 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. 393, the company, a corporation of New Jersey, had paid the fees required by the laws of the state of foreign corporations, as a condition precedent to transacting business in the state, and by those laws they were subject to the same liabilities as domestic corporations. It then made an investment of $5,000,000. Later an additional tax was imposed upon foreign corporations, which this company resisted, and a judgment of forfeiture therefor, affirmed by the Supreme Court of the state, was reversed by the Supreme Court of the United States, where it was held that the company obtained the

right to enter and do business in the state, and that it was not a mere license to do so "liable to be revoked or the sum increased at the pleasure of the state, without further limitation. It was a clear contract that the liabilities, etc., should be the same as the domestic corporation, and the same treatment in that regard should be measured out to both." and that the later act impaired the obligation of that contract.

In Chicago, R. I. & P. Ry. Co. v. Swanger (C. C.) 157 Fed. 783. It appeared that by the laws of the state railroad corporations of adjoining states were authorized to build or acquire continuous lines in the state and were to be subject to the same regulations as corporations of the state. A later act was passed which provided that, if a railway corporation doing business between points in Missouri should without the consent of the other party remove a case from a state court to an United States court, its license to do business in the state should be forfeited and penalties added. The court said:

> "It is stoutly denied that there is any contract, and, of course, there must be a contract before the obligation of one can be impaired. What was the contract? The state gave it the power of eminent domain. In many instances it gave it pecuniary aid. It gave it the rights of a common carrier. It gave it the right to charge reasonable prices for its services. It promised it the equal protection of the laws as to taxation, and equal protection with others against all who might seek to injure its property or earning power. The state in effect said: 'Make your investments, and we will give you these rights.' The company accepted the offer and made the investments, and now cannot remove if it so desired, because it has a contract in perpetuity to serve the people as a common carrier and to give efficient service for reasonable remuneration. That there is a contract is easily discerned."

According to the principles of the adjudged cases, while they differ in their facts, it is established that by the purchase of these railroads, pursuant to the laws applicable and upon the terms, obligations, and considerations shown, contracts were made, obligations of which are that the state, succeeding to the domain of the territories, should respect and not destroy the vested right of the complainant to the use and benefit of its property in carrying on its railroad operations within the state and should not vary the terms of the exercise of that right beyond the legitimate scope of its police powers.

The act, so far as it has application to the complainant, proposes the revocation and forfeiture of valuable rights and privileges amounting to franchises. There being, as already shown, an absence of legislative power reserved or properly exercised to that end, this could not be accomplished by legislative declaration, and in no event except upon adequate grounds, by judicial proceedings regularly instituted for that purpose, and it is not the subject of collateral inquiry. 2 Clark & Marshall, Pri. Corp. § 313; 1 Elliott on Railroads, §§ 47, 48, 55. It is clear therefore that the enforcement of the act against the complainant would not only impair the obligations of contracts, but also deprive it of its property without due process of law.

The complainant challenges the act for other reasons. It is asserted that it is an interference with interstate commerce—a subject committed by the federal Constitution to congressional regulation. The language of the act confines its operation to "transacting business within said state of Oklahoma." If it extends to the interstate transactions

of the complainant, it must necessarily be void in that respect. Butler Bros. v. U. S. Rubber Co., supra. The rule is that every reasonable construction should be given to an act to save it from being unconstitutional. Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297. And although interstate commerce may be in part carried on within a state, a reasonable construction of the act would limit its meaning to intrastate commerce alone. Chesapeake v. Kentucky, 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244. But by holding that the act relates solely to such commerce, it is not aided, as all that has been said has been upon the assumption that it had only such relation.

Further grounds are also urged against the validity of the act; but a decision thereon is not essential, and for that reason, and not for want of merit, they may be withheld from present consideration.

It remains to be determined whether the foregoing propositions are controlling, in view of certain grounds advanced by the defendants in support of a contrary ruling.

The argument is made that, because of the public nature of the business of a railway company, it is a joint enterprise, and that the state may deprive it of its public property. The inquiry is submitted: "Why may not the public, a partner in the industry, prohibit the further prosecution of the joint enterprise?" The question has already been answered. The contract relations involved are such that the state is bound to adhere to the obligations imposed by them. A different answer is said to be found in the case of Myers v. Manhattan Bank, 20 Ohio, 302, which is supposed to hold that a state may prohibit foreign corporations in the further use of a banking franchise granted before statehood; but that case decided that an act of a voluntary state Legislature of Michigan, before the admission of the state, and during the existence of the territorial government, incorporating and authorizing the bank to do a banking business at Manhattan, in Lucas county, was void, and that even if duly incorporated by the law of Michigan, yet, the privilege or contract being in conflict with the laws of Ohio, it was not valid therein after the transfer to Ohio of Lucas county.

Another contention of the defense is that, as the state has succeeded to the power of eminent domain within its limits, the complainant, not having complied with section 31 of article 9 of the state Constitution, is excluded from the use and benefit of its right of way. That section provides that no railroad corporation organized under the laws of any other state or of the United States shall be entitled to the benefit of the right of eminent domain in the state until it shall become a body corporate pursuant to or in accordance with the laws of the state. It is to be assumed that the state has succeeded to this power upon an equality with the other states of the Union. Still, the proposition is subject to fatal objections. If there were prior contracts whereby the use and enjoyment of the right of way were vested in complainant, that section, if given the application contended for, would be, as has been shown, obnoxious to the federal Constitution; but regarding the language of the section, and in the absence of the expression of a contrary intention, it would seem plainly intended to refer only to future applications for the benefit of the right. Such is the rule of construing Constitutions. Cooley, Const. Lim. (7th Ed.) 97. Furthermore,

the same Constitution declares against the impairment of the obligation of contracts and the taking of property without due process of law, and the foregoing construction must be correct, because, as said by the Supreme Court of Oklahoma (Arie v. State, 100 Pac. 23):

"The entire instrument is to be examined in arriving at the meaning of any part thereof, and to be construed as a whole. Effect is to be given, if possible, to each section, clause, and word; and, if any part be doubtful, it must be interpreted with every fair intendment to harmonize with the main purpose and not to defeat it."

It is also contended that the complainant itself surrendered its right to carry on interstate or intrastate business by acquiring its railway property from several companies which under a joint ownership by its stockholders ceased to be in active competition for trade and commerce, in violation of the Anti-Trust Act of Congress of July 2, 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), as applied in the case of Northern Securities Co. v. U. S., 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, and the anti-trust laws of the state, and that this defense may here be availed of upon the doctrine of the case of Continental Wall Paper Co. v. Voigt, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. ——. In the former case it was said:

"What the government particularly complains of, indeed, all that it complains of here, is the existence of a combination among the stockholders of competing railroad companies which, in violation of the act of Congress, restrains interstate and international commerce through the agency of a common corporate trustee designated to act for both companies in repressing free competition between them."

The contention is not based upon any facts alleged in the amended bill. It does not appear that competitive lines were acquired, or that there was any combination of stockholders. There is no occasion to pass upon these purely abstract questions of law upon the subject of either national or state anti-trust legislation.

With reference to the supposed application of section 8 of article 9 of the state Constitution, proscribing and limiting the right of foreign and federal corporations to consolidate with, lease, or purchase parallel or competing lines, and of section 9 of that article, prohibiting domestic corporations from consolidating with or selling their property to such corporations, it is sufficient to say, without intimating any further opinion, that by the language of those sections and the settled principles of construction they do not apply to past transactions.

Another contention is that the congressional acts which granted the corporate rights to the original companies contained terms relative to maximum transportation charges amounting to conditions, and that the complainant being bound to plead a performance of those conditions, but having departed from such rates, and thus violated and forfeited its contracts, has no standing to insist upon them. Assuming, but not deciding, that these rates have not been superseded by subsequent legislation, it is clear that no burden of pleading an adherence to them can rest upon the complainant, because such an issue could not be inquired into collaterally, and hence is no proper subject to be set out in any pleading in this suit.

It is also insisted in support of the demurrer that the defendant Meyer actually made the declaration against the complainant, revoking its authority in the state. In the amended bill it is alleged that the signing of the instrument was "subsequent to the institution of the suit." It bears date one day later than that of the filing of the original bill and of the preliminary order restraining its issuance, but on the day of service of the order. Presumably it was executed before the order became effective or was served. It does not appear that "a foreign domicile" was alleged in the petition for removal or was the ground of the declaration; but assuming that such domicile was alleged, and the fact certified to the Secretary as contemplated in the legislative act, still must the relief prayed for be denied because the declaration shortly preceded the time when the order became effective or was served? The point is highly technical and goes to an avoidance of a decision on the merits. It is not available. This court had acquired jurisdiction over the subject-matter of the suit before the defendant acted, and he could not therefore prejudice or defeat the rights of the complainant. In such a case a court of equity has ample "power to compel by mandatory injunction the restoration of the former condition of things," and prevent the gaining of advantage by reason of the wrongful act. 22 Cyc. 743 ; Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110; High on Injunctions (4th Ed.) § 5a; Bispham's Prin. Eq. 400; Gibson's Suits in Chancery, § 824.

The demurrer will be overruled.